No. 99,479

STATE OF KANSAS, *Appellee*, v. KAMERON KING, *Appellant*.

(305 P.3d 641)

Opinion filed August 9, 2013.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause, and *Carl Folsom, III*, of the same office, was on the brief for appellant.

*Jennifer L. Myers*, assistant district attorney, argued the cause, and *Jennifer S. Tatum*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were on the brief for appellant.

The opinion of the court was delivered by

LUCKERT, J.: Kameron King was convicted by a jury of one count of arson, three counts of criminal threat, one felony count of criminal damage to property, one misdemeanor count of criminal damage to property, one count of assault, one count of battery, and one count of domestic battery. We reverse two of King's convictions

for criminal threat, rejecting the State's theory that the unit of prosecution for a criminal threat is the number of victims who perceive and comprehend the threat. Instead, we hold there can only be one conviction for a single communicated threat, regardless of the number of victims who perceive and comprehend the threat. We also reverse King's conviction for felony criminal damage to property because the evidence established multiple acts, the trial court did not instruct the jury it had to unanimously agree on the act that supported the conviction, and we are firmly convinced that the error affected the verdict.

In addition, we find two other errors but determine these errors were harmless when considered both individually and cumulatively. One of these errors was committed when the trial court failed to obtain a waiver of King's right to be present in open court and then violated that right by answering a question posed by the jury during deliberations without King being present. The other error occurred when the trial court gave the jury an erroneous deadlocked jury instruction.

We reject the other arguments advanced by King. One of these arguments is that K.S.A. 60-455 prohibited the admission of evidence of other crimes that were committed at the same time as the crimes for which King was on trial. The other is that it was unconstitutional for the sentencing court to consider King's criminal history when that history had not been alleged in the complaint or proven to a jury.

## FACTS AND PROCEDURAL BACKGROUND

King's convictions result from a series of events that occurred on June 20, 2006. At trial, the State and King presented different versions of these events. A detailed summary of this evidence is necessary because several of King's arguments require us to determine whether an error was harmless. In our discussion of the facts, we will refer to everyone except King by first name because many of the witnesses share surnames.

One witness, Kelly Riley, testified she had known King for 14 years and he was the father of three of her four children. King and Kelly had separated in early 2006. Kelly testified that on June 20,

2006, she received approximately 45 telephone calls from King during which he screamed and yelled at her because she was seeing another man. She also said that King threatened to steal and burn her van and kill several people, including her.

King's anger at Kelly was apparent in his interaction with others on June 20, 2006. For example, King approached Kelly's aunt, Theresa Smith, at a baseball game. Theresa indicated King's breath smelled of alcohol, and she described him as being "pretty angry" about Kelly having a boyfriend.

King was also upset with his father, James King, and wanted his father to evict Kelly from the house she was renting from King's grandmother. King allegedly acted on this anger by ramming a stolen white flatbed truck into vehicles owned by his father. James testified that at approximately 10:30 p.m. he heard a loud, crashing noise outside his house. He described the noise as sounding like one vehicle colliding with another. Three vehicles—a van, a truck, and an El Camino—were parked in front of James' garage. James went outside and saw that his van had been shoved into the garage; he did not see any damage to the other vehicles.

An eyewitness testified she saw a white flatbed truck repeatedly drive into the van in James' driveway before driving off. The eyewitness testified the truck only hit the van, but the van was pushed into the El Camino. The witness described the truck to James.

Meanwhile, King drove to Kelly's house, arriving about an hour after his last telephone call to her. Kelly's four children; her friend, Katie Kelly; and a friend of Katie's were also present. King entered the house without a shirt and was visibly bleeding from his chest. He told Kelly he had been injured while fighting with a friend. He then grabbed a beer from the kitchen, sat down in the living room, and started arguing with Kelly. Both Kelly and Katie testified that King slapped Kelly across the face with an open hand while they were arguing.

A short time later, Theresa called to warn Kelly about King's behavior at the baseball game. Kelly told Theresa that King had already slapped her and that she would call if she needed help. After a while, Theresa called again. Kelly answered the telephone crying, and Theresa could hear King throwing things in the back-

ground. Theresa asked to talk to King to see if she could calm him down. King took the telephone and stated that it was his house, and he would burn it down if he wanted.

James also called Kelly and told her someone had hit his cars. Kelly asked King if he caused the damage. He denied responsibility and said he was driving a yellow car. James decided to make the 5-minute walk to Kelly's house. He saw a white flatbed truck with a damaged front end parked near Kelly's house. James confronted King about the damaged cars. King again denied responsibility and started physically fighting with James. While they were fighting, Kelly noticed the white flatbed truck, but she could not tell if there was any damage to the front end.

When the fighting ended, King got back into the white flatbed truck, and headed in the direction of James' house. James also returned to his house where he found that his van had been further damaged and his El Camino had been damaged. The eyewitness testified that the same white flatbed truck and driver she had seen earlier returned approximately 5 to 10 minutes after the original incident. She observed the truck slam into James' vehicles again. At trial, the eyewitness identified King as the driver of the truck.

While King and James were fighting, Katie put Kelly's children into Katie's car and took them to Shawn and Amanda Velasquez' house. Shawn and Amanda had known King and Kelly for many years, but King and Amanda did not get along. Then, Katie returned with Amanda and another woman. King was gone when they first arrived, but he returned before they went into the house. When King saw Amanda, he yelled at her, told her she had no business on the property, and told her to leave before he started throwing things at her. Acting on his words, King started throwing handfuls of small rocks at Amanda, a few of which hit her.

Meanwhile, Kelly called Shawn, who quickly arrived and began physically fighting with King. Kelly, Amanda, and Katie were within 15 feet of the fight. Each of them testified about threats King made. Kelly testified that King yelled that he was going to shoot everyone, everyone was going to die, and everyone was going to get shot if they did not get off his property. While making these threats, King reached behind his back as if he had a gun. Amanda

testified that King told them to get off his property and that he kept putting his hand in his back pocket. Amanda further testified that King was directing the threats toward Shawn. Katie similarly testified that King acted like he had a gun and that he said "he had a gun and we all needed to leave, he was going to shoot Shawn." According to Shawn, King told him that he "had ten seconds to leave. Said he was counting to ten and then he was going to shoot me, so I left." Shawn also indicated that King kept reaching behind his back as if he had a gun.

Kelly went back into the house and locked the doors, and the others left. King then kicked down the front door. Kelly fled the house while King threw full beer cans at her. Kelly stopped nearby and watched King go to a shed and back to the house. A few minutes later, Kelly saw that the house was on fire; eventually, the fire destroyed the home.

About 3 minutes after Kelly first noticed flames, she saw King get into her van, which he did not have permission to drive. Law enforcement officers arrived at this point, and King tried to drive away. He wrecked the van and then took off on foot. King was arrested a few days later.

King testified at trial and presented a very different account of the events of June 20, 2006. In describing what led up to his arrival at Kelly's house that night, he explained that he ran into Shawn at a gas station. Shawn was driving a white flatbed truck, and he asked King to get in with him. As they were driving, Shawn dropped a cigarette and swerved while trying to pick it up. In doing so, Shawn hit James' El Camino. King denied any knowledge about damage to his father's van. He explained that neither he nor Shawn wanted a confrontation with King's dad, so they went to Kelly's house. He denied having called Kelly earlier in the day.

When they arrived at Kelly's house, he got out of the truck and went inside while Shawn stayed outside. Kelly started yelling at King, so he took his children next door to his grandmother's house. King then talked to Shawn and told Shawn that he needed to pay for the damage to the El Camino. Shawn took a swing at King, and the two were fighting when James arrived. At one point, King accidentally shoved James. James then confronted King about hitting

the vehicles, which King continued to deny. Then James went to King's grandmother's house, and King told Shawn to drive the white flatbed truck away before the police arrived. Shawn left and Amanda arrived. King told her to get off the property, but Amanda went inside Kelly's house. King returned to his grandmother's, told her goodbye, left her house by the back door, and went to a friend's house.

A jury convicted King of all counts with which he had been charged, except for a count of child endangerment. King was sentenced to 63 months' incarceration.

King appealed his convictions and sentences to the Court of Appeals. That court rejected King's claims of error on some issues and agreed with his claims on others but found those errors harmless. Consequently, his convictions and sentences were affirmed. *State v. King*, No. 99,479, 2010 WL 3488659 (Kan. App. 2010) (unpublished decision).

King filed a petition for review, asserting the same eight arguments he brought before the Court of Appeals: (1) The trial court erred in denying his motion for mistrial based on the admission of prior crimes evidence; (2) his right to be present during a critical stage of the trial was violated; (3) the trial court misstated the law in responding to a jury question; (4) his three convictions for criminal threat are multiplicitous in violation of double jeopardy; (5) the trial court failed to give a unanimity instruction for the felony criminal damage to property count; (6) the trial court erred in giving an *Allen*-type instruction; (7) cumulative error warrants reversal of his convictions; and (8) the trial court violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it used his criminal history to calculate his sentence.

This court granted King's petition for review and has jurisdiction under K.S.A. 20-3018(b) (petition for review).

## NO ERROR IN DENIAL OF MISTRIAL

First, King argues the trial court committed reversible error when it denied his request for a mistrial based on the improper admission of K.S.A. 60-455 evidence.

A mistrial is appropriate if there is "[p]rejudicial conduct, in or outside the courtroom, [which] makes it impossible to proceed with the trial without injustice to the defendant or the prosecution." K.S.A. 22-3423(1)(c). In applying this statute, a trial court utilizes a two-part test. "First, the trial court must decide if ' "there is some fundamental failure of the proceeding." ' [Citations omitted.] If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an 'injustice.' " *State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

On appeal from a trial court's decision to deny a mistrial, an appellate court focuses on the two questions and asks if the trial court abused its discretion in analyzing those questions. *Ward,* 292 Kan. at 551.

In this case, the trial court ruled that the evidence on which King based his motion for mistrial was not evidence covered by K.S.A. 60-455; in other words, the court determined there was not a fundamental failure in the proceeding. Hence, we must determine if the trial court erred in this determination.

The objected-to evidence, which related to threats King made toward Amanda and to whether she saw King with a gun, was admitted during the State's redirect examination of Amanda. To understand its significance, it is helpful to place the evidence in context. The question that King objected to on redirect appears to have been prompted by Amanda's testimony during defense counsel's cross-examination of her. Defense counsel asked her if it was "true that you told the detective that you saw a gun that night?" The reference was clearly to June 20, 2006. Amanda replied by stating: "That's what my statement says." In the exchange that followed, Amanda indicated she had not seen a gun, and she was not sure why her statement read that way. She speculated that the detective "may have misunderstood what I said, because [King] kept reaching in his back pocket like he had a gun." Then, on redirect examination, the prosecutor asked Amanda to read the portion of the statement referred to by defense counsel. Amanda complied, reading the following statements: "[H]e's done threatened me several times. He—he showed me that he's got the gun."

The prosecutor then asked Amanda if she had described the gun. She responded: "I did. I don't—I don't know why—I mean, I did not see a gun." When the prosecutor asked if she was speaking of a gun she saw on June 20 or before, defense counsel objected before Amanda could answer. Defense counsel immediately moved for a mistrial on the grounds that evidence had been admitted in violation of K.S.A. 60-455. After the trial court denied the motion based on its conclusion that K.S.A. 60-455 did not apply, the prosecutor resumed questioning Amanda without her answering the objected-to question and without the prosecutor asking any further questions about her statement or the gun.

On appeal, the Court of Appeals agreed the evidence had not been erroneously admitted. The Court of Appeals noted that "after reading Amanda's entire testimony, it appears . . . Amanda was talking about how King threatened her several times that night, not about times he may have threatened her in the past." *King*, 2010 WL 3488659, at *4-5. The Court of Appeals then stated: "An important prerequisite to the exclusion of evidence under K.S.A. 60-455 is that the evidence be of the person's *prior* bad acts." 2010 WL 3488659, at *4.

We agree with the trial court and the Court of Appeals in the conclusion that the evidence was not excluded by K.S.A. 60-455. We disagree, however, with the sequencing of acts required by the Court of Appeals when it stated that a "prerequisite to the exclusion of the evidence under K.S.A. 60-455 is that the evidence be of the person's *prior* bad acts." K.S.A. 60-455 does not use the word "prior" or any of its synonyms. Rather, it states, in relevant part: "[E]vidence that a person committed a crime or civil wrong on *a specified occasion*, is inadmissible . . . as the basis for an inference that the person committed another crime or civil wrong *on another specified occasion*." (Emphasis added.) Under the plain language of this provision, the other crime or civil wrong can be committed either before or after the crime or civil wrong at issue in the trial.

Nevertheless, in this case, the only possibility is that the crime occurred prior to June 20, 2006. Hence, the Court of Appeals' statement is inconsequential in the context of this case and the

Court of Appeals' ultimate point is correct: K.S.A. 60-455 does not apply if the evidence relates to crimes or civil wrongs committed as part of the events surrounding the crimes for which King was on trial—that is, the res gestae of the crime. As we noted in *State v. Peppers*, 294 Kan. 377, 389, 276 P.3d 148 (2012),"[o]ur decision in [*State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006)] eliminated res gestae as an *independent basis* for the admission of evidence. It did not eliminate the admission of evidence of events surrounding a commission of the crime under the applicable rules of evidence." In other words, if a rule of evidence prohibits the admission of evidence, res gestae evidence does not become admissible simply because it establishes the circumstances surrounding the criminal act or civil wrong. On the other hand, res gestae evidence is not automatically inadmissible; rather, if the evidence is relevant it can be admitted unless a rule of evidence prevents its admission. See K.S.A. 60-407 ("Except as otherwise provided by statute . . . (f) all relevant evidence is admissible.").

In this case, while it is unclear what time frame Amanda was using in her statement to the detective, any ambiguity was clarified during Amanda's trial testimony because defense counsel's questions specifically limited the scope to the night of June 20, 2006. The prosecutor's attempt to inquire about whether Amanda's statements to the detective had been similarly directed to June 20 was cut off by defense counsel's objection, and the jury never heard her answer. Consequently, the evidence was limited to acts occurring during the chain of events at Kelly's house on June 20.

We agree with the trial court and the Court of Appeals in the conclusion that the evidence was admissible and was not excluded under K.S.A. 60-455 as evidence of a crime committed by King on an occasion other than the one for which he was on trial. This means there was not a fundamental failure in the proceeding and King was not entitled to a mistrial.

## REVERSIBLE ERROR RELATING TO CRIMINAL THREAT CONVICTIONS

Next, King presents three issues related to his three convictions for criminal threat. To frame those issues, some clarification of the

threat at issue is necessary because there was evidence of several threats made on June 20, 2006. But during closing arguments, the State elected one threat to support the three counts charging King with making a criminal threat. In doing so, the prosecutor argued: "Boom, I'm going to shoot you if you don't get off my property in ten seconds. I'm holding my hand behind my back." Then, after discussing the witnesses' testimony, the prosecutor argued that King communicated the threat in "reckless disregard" and that Shawn, Amanda, and Katie heard it.

The jury asked two questions during its deliberations, seeking clarification of the law regarding a criminal threat. The handling of these questions and the trial court's answers give rise to two of King's issues. In another issue, King argues his three criminal threat convictions are multiplicitous.

*Defendant's Right to Be Present In Open Court When Judge Answers Jury's Question*

In one question, the jury asked for a "description of intent to terrorize." King raises a procedural issue regarding the manner in which this question was answered. Specifically, King notes there is nothing in the record establishing whether the court informed King or either counsel of the question or that the court consulted with them regarding the appropriate answer. It appears the judge, without opening court, responded to the question in writing by providing the jury with a definition of the words "terrorize" and "threat." On appeal, King argues his right under K.S.A. 22-3405 and the Sixth Amendment to the United States Constitution to be present during all critical stages of his trial was violated when the judge answered the question without his presence or, alternatively, a waiver of that right. The Court of Appeals agreed that King's right to be present at a critical stage of trial had been denied, but it found the error was harmless. *King*, 2010 WL 3488659, at *8.

In a decision filed after the Court of Appeals' decision in this case, we rejected a similar contention that a defendant has a constitutional right to have a jury's question answered in open court rather than in a writing delivered to the jury. We stated:

"[The defendant] claims that sending an answer back to the jury rather than reading the answer in the presence of the defendant violates his constitutional right to be present at all critical stages of the trial, citing *State v. Coyote*, 268 Kan. 726, 732, 1 P.3d 836 (2000). [The defendant's] reliance on *Coyote* is misplaced. In *Coyote*, this court stated:

> 'The trial court's written response of "no" to the jury without more is error. A trial court, when confronted with a question submitted to it by a jury during deliberations is required to advise counsel, provide the parties with the question, and give them an opportunity for input in the presence of the defendant. *Thereafter, the court is required to respond in writing to the jury in the presence of the defendant.* The court did not follow this procedure and its failure constitutes error.' (Emphasis added.) *Coyote*, 268 Kan. at 732.

"Here, the trial court followed the procedure outlined by this court in *Coyote*. [The defendant] and his counsel were present and informed of the jury's question. The judge asked if there were any objections, and defense counsel proposed an alternative phrasing for the answer." *State v. Burns*, 295 Kan. 951, 956, 287 P.3d 261 (2012).

The implication of the *Burns* decision, if not its clear message, is that it is not necessary to open court when delivering a written answer to a jury question, even if the defendant has not formally waived that procedure. However, the *Burns* decision did not cite K.S.A. 22-3420(3), and it did not mention the rest of the *Coyote* court's analysis, which is contrary to the implication of the *Burns* decision. The *Coyote* court continued its analysis by stating:

"K.S.A. 22-3420(3) explicitly requires that any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is absent voluntarily. The State notes that we have generally held that the defendant's right to be present does not extend to proceedings involving matters of law, citing *State v. Sanders*, 227 Kan. 892, 893-94, 610 P.2d 633 (1980), and argues that the jury's question was one of law.

"In *Sanders*, we found that an in-chambers argument on a motion in limine was not a critical phase of the trial requiring the presence of the defendant. 227 Kan. at 894. However, the State's argument in this case ignores the fact that the defendant's right to be present extends to any communication between the trial court and the jury. [Citation omitted.] Thus, there is no question that the trial court's failure to answer the jury's question in the presence of the defendant violated the defendant's statutory and constitutional rights." *Coyote*, 268 Kan. at 732.

*Burns* did not explain why the *Coyote* court's ultimate conclusion was wrong. Moreover, the holding in *Burns* is not only inconsistent with *Coyote* it is inconsistent with the recent decision of *State v. Herbel*, 296 Kan. 1101, 299 P.3d 292 (2013). In *Herbel*, as in *Coyote*, we applied K.S.A. 22-3420(3), which provides:

"(3) After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, *they may request the officer to conduct them to the court*, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them *in the presence of the defendant*, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." (Emphasis added.)

A potential violation of this provision arose in *Herbel* because the record did not clearly establish Randy Herbel's presence or waiver of presence when an admitted exhibit—a DVD of his statement to law enforcement officers—was replayed in open court to the deliberating jury at the jury's request. We concluded that K.S.A. 22-3420(3) "plainly mandates that the evidence 'shall be . . . exhibited to [the jury] *in the presence of the defendant* unless he voluntarily absents himself.' (Emphasis added)." 296 Kan. at 1109.

The context for this holding in *Herbel*—a jury request to have evidence exhibited—is different from the context of the issue in this case—a jury question regarding the law. This difference does not lead to a different result, however. K.S.A. 22-3420(3) plainly applies to both contexts; by its own terms it applies whenever the jurors "desire to be informed as to any part of the law *or* evidence." (Emphasis added.)

Consistent with our holding in *Herbel* and *Coyote*, we overrule the statement in *Burns* suggesting that a jury question need not be answered in open court even if a defendant has not waived his or her presence. As the defendant argued in *Burns* and as King now argues, any question from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is voluntarily absent. *Coyote*, 268 Kan. at 732. In the present case, in a pre-*Burns* argument, the State concedes that the trial court erred in responding to the jury question outside of King's presence.

In *Herbel,* we also discussed the harmless error analysis that should be applied when there is a violation of K.S.A. 22-3420(3). We concluded acts or omissions violating K.S.A. 22-3420(3) also violate K.S.A. 22-3405(1) ("The defendant in a felony case shall be present . . . at every stage of the trial . . . except as otherwise provided by law.") and the guarantee of the Sixth Amendment to the United States Constitution that a criminal defendant may be present at every critical stage of his or her trial. We further clarified that when violations of both statutory and federal constitutional rights arise from the same acts and omissions, we need not apply both the nonconstitutional and the federal constitutional harmless error standards when determining if an error is reversible. Instead, we will apply only the more rigorous of the two standards—the federal constitutional harmless error standard stated in *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Herbel,* 296 Kan. at 1110-11; see *Coyote,* 268 Kan. at 732. Under this standard,

"error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* where there is no reasonable possibility that the error contributed to the verdict." *Ward,* 292 Kan. 541, Syl. ¶ 6.

As applied to this case, the State argues the breakdown in procedure did not affect the accuracy of the trial court's response to the jury question. It points to the trial court's use of widely recognized definitions for the terms "terrorize" and "threat" under caselaw applying K.S.A. 21-3419(a)(1). See *State v. Gunzelman,* 210 Kan. 481, 486, 502 P.2d 705 (1972) (defining "threat" and "terrorize" to determine if the statute was unconstitutionally vague); PIK Crim. 3d 56.23 (criminal threat). King does not argue otherwise or that the answer would have been different had he been present, but he insists the answer did not fully address the question because the court did not address intent. The State counters that an additional explanation of intent was not necessary because the court had given a separate instruction informing the jury of the intent element. And it is well settled that, in considering if the jury could possibly have been misled by an error in jury in-

structions, an appellate court is required to consider the instructions as a whole and not isolate any one instruction. *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

Nevertheless, the answer did not direct the jury's attention to instructions addressing the intent element, and King argues there is reason to believe there is a reasonable possibility that failure might have affected the verdict. He bases this argument on a notation on two of the criminal threat verdict forms where a juror wrote "undecided." This word was crossed out, and the jury entered its guilty verdict on the form. Generally, it is not the proper function of an appellate court to speculate about a jury's deliberations or delve into the mental processes of the jury. See *State v. Beach*, 275 Kan. 603, 619, 67 P.3d 121 (2003); see also *Saucedo v. Winger*, 252 Kan. 718, 729, 850 P.2d 908 (1993) ("mental process of a juror in reaching a verdict or the factors which influence the mental process cannot be inquired into for the purpose of impeaching a verdict"). In addition, King's suggestion only affects the verdict for two of the counts and his other issues relate to those counts as well. As we will discuss, there was another error affecting those counts that we do not deem harmless. Hence, at this point, we need not dwell further on whether the error caused by the court's failure to follow the mandate of K.S.A. 22-3420(3) was reversible.

*Unit of Prosecution Is Based on a Single Communicated Threat*

The other question asked by the jury is closely related to yet another of King's arguments, which is that the three counts of criminal threat in violation of K.S.A. 21-3419(a)(1) are multiplicitous because they are based on the same conduct—King's threat to shoot if Shawn, Amanda, and Katie did not get off "his" property. He argues this conduct should constitute only one violation under the statute. In addition, he argues the trial court erred in answering a question the jury posed that goes to the heart of the issue of whether one communicated threat can be the basis for multiple convictions. The jury asked: "If a terrorist threat is communicated to one party both verbally and with actions can those actions be considered a terrorist threat to another person in the same vicin-

ity?" The trial court answered: "Yes." The Court of Appeals agreed with the answer and rejected King's claim of error.

In analyzing these related issues, we begin by examining the question of whether the three convictions are multiplicitous. This court has consistently stated that "multiplicity is the charging of a single offense in several counts of a complaint or information." *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2008); *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006). "The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." *Thompson*, 287 Kan. at 244.

Questions involving multiplicity are questions of law subject to unlimited appellate review. *Schoonover*, 281 Kan. at 462. When analyzing a claim of double jeopardy,

"the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" *Schoonover*, 281 Kan. at 496.

Here, the State concedes that the criminal threat convictions arose from the same conduct—King's threat to shoot if Katie, Amanda, and Shawn did not get off "his" property and King's action of reaching behind his back, implying he may have had a gun.

Thus, our focus is on the second inquiry of whether the conduct constituted one or more offenses by statutory definition. Because the three convictions are for multiple violations of a single statute, the second inquiry is answered by the unit of prosecution test. See *Schoonover*, 281 Kan. at 497-98. "Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution." *Schoonover*, 281 Kan. at 497-98; see, *e.g.*, *State v. Sprung*, 294 Kan. 300, 308-11, 277 P.3d 1100 (2012) (determining the aggravated indecent liberties statute creates only a single unit of prosecution); *Thompson*, 287 Kan. at 246-50 (determining that the possession of precursors

statute proscribes a single unit of prosecution in the intent to manufacture); *State v. Harris*, 284 Kan. 560, 572-78, 162 P.3d 28 (2007) (under the capital murder statute, it is the existence of a second victim that makes the murder punishable by death, thus the unit of prosecution is the intentional and premeditated killing of more than one person); *State v. Pham*, 281 Kan. 1227, 1248-51, 136 P.3d 919 (2006) (finding that the aggravated robbery statute allows for more than one count for one act if more than one person is stolen from); *State v. Whetstone*, 43 Kan. App. 2d 650, 652-53, 229 P.3d 399 (2010), *rev. granted* January 20, 2012 (determining the unit of prosecution in the criminal threat statute is the threat to commit violence communicated to another); *State v. Gomez*, 36 Kan. App. 2d 664, 672-73, 143 P.3d 92 (2006) (finding the unit of activity the legislature intended to punish is the discharging of firearms at a certain target, a dwelling, and the number of people in the dwelling did not change the punishment).

In considering the unit of prosecution test, "[t]he determination of the appropriate unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Rather, the key is the nature of the conduct proscribed." *Schoonover*, 281 Kan. at 472; see *Sprung*, 294 Kan. at 310; *Thompson*, 287 Kan. at 245; *Harris*, 284 Kan. at 573. Also, in *Schoonover* we cited *Bell v. United States*, 349 U.S. 81, 83-84, 75 S. Ct. 620, 99 L. Ed. 2d 905 (1955), for its recognition that there could be a separate conviction for each victim if the legislature authorized such a unit of prosecution " 'clearly and without ambiguity.' " See *Schoonover*, 281 Kan. at 472. As we stated in *Pham*, 281 Kan. at 1248: "In the absence of clear legislative intent, the rule of lenity presumes a single physical action harming multiple victims is only one offense."

The determination of the legislative definition of the scope of conduct raises questions of statutory interpretation, which are issues of law subject to de novo review. *Schoonover*, 281 Kan. at 471. In situations in which a court is called upon to interpret or construe statutory language, the touchstone is legislative intent. To determine legislative intent, a court begins by examining and interpreting the language the legislature used. Only if that language is am-

biguous does a court rely on any revealing legislative history, background considerations that speak to legislative purpose, or canons of statutory construction. When a statute is plain and unambiguous, a court merely interprets the language as it appears; a court is not free to speculate and cannot read into the statute language not readily found there. *State v. Brown*, 295 Kan. 181, Syl. ¶ 5, 284 P.3d 977 (2012); *Thompson*, 287 Kan. at 243-44; *Harris*, 284 Kan. at 572.

Consequently, our analysis necessarily begins with the wording of K.S.A. 21-3419(a), which provides:

"(a) A criminal threat is any threat to:
(1) Commit violence communicated with intent to terrorize another, or to cause the evacuation of any building, place of assembly or facility of transportation, or in reckless disregard of the risk of causing such terror or evacuation;
(2) adulterate or contaminate any food, raw agricultural commodity, beverage, drug, animal feed, plant or public water supply; or
(3) expose any animal in this state to any contagious or infectious disease."

Applying this text to King's arguments, the Court of Appeals determined the plain meaning of the statute "shows that the proscribed conduct is the making of a criminal threat" and that the conduct proscribed has a specific statutory definition: "It is a threat made either with the intent to terrorize another or in reckless disregard of causing such terror to another." *State v. King*, No. 99,479, 2010 WL 3488659, at *9 (Kan. App. 2010) (unpublished decision). The court reasoned that "[w]hen a person intends to terrorize more than one person with a single threat or makes a single threat in such disregard of others that it terrorizes more than one person, the legislature has made it a separate crime with respect to each person so terrorized." 2010 WL 3488659, at *9. Focusing on the types of intent appearing in the statute, the court held King's convictions were not multiplicitous because "King appears to have acted intentionally regarding one victim and recklessly with regard to the other two." 2010 WL 3488659, at *9.

We do not understand the factual basis for the Court of Appeals' conclusion that King intended to terrorize Shawn but only recklessly terrorized Amanda and Katie. King's threat—under any witness' version—clearly communicated an intent to motivate all of

them to leave or King would start shooting. And at least one witness testified the threat was to shoot all of them. Additionally, even if we accept the factual distinction, the justification only differentiates between the count listing Shawn as the victim and the two counts listing Amanda and Katie as victims; it does not explain why the separate counts against Amanda and Katie are not multiplicitous. Moreover, we disagree with the Court of Appeals' legal analysis.

We are not the only ones to do so. A different panel of the Court of Appeals reached the opposite conclusion in *Whetstone*, 43 Kan. App. 2d 650, concluding that one threat communicated to two individuals constituted one offense. The *Whetstone* panel noted that a plain reading of K.S.A. 21-3419(a)(1), which proscribes conduct where the offender makes a threat "to cause the evacuation of any building, place of assembly or facility of transportation," does not make the number of persons an element of the crime; simply communicating a threat to take a specified action leads to the conviction. The panel concluded this intent extended to any type of threat listed in K.S.A. 21-3419(a)(1). 43 Kan. App. 2d at 652. The *Whetstone* panel also noted that the statute does not require a defendant to know the threat would be communicated to the victim, citing *State v. Wright*, 259 Kan. 117, 911 P.2d 166 (1996), and *State v. Woolverton*, 284 Kan. 59, 159 P.3d 985 (2007). This means that the unit of prosecution is not dependent on how many people ultimately perceive the threat. Next, the panel looked to the definition of "another" in K.S.A. 21-3110(2), which defines the term as used throughout the criminal code. That definition covers both singular and plural—"person or persons." Hence, the panel determined that "the number of persons to whom the threat is communicated does not determine the unit of prosecution." Ultimately, the panel held "the unit of prosecution is the making of a threat to commit violence communicated to another," and the defendant's convictions for criminal threat were multiplicitous. *Whetstone*, 43 Kan. App. 2d at 653.

Although King does not cite directly to *Whetstone*, he does point to the part of K.S.A. 21-3419(a)(1) that proscribes conduct where a person makes a threat to evacuate a structure and argues this

language makes it clear that the legislature intended only one conviction for a criminal threat regardless of the number of people inside the structure. He argues this intent clarifies the intent as to all types of threats listed in K.S.A. 21-3419(a)(1)—terrorizing another; or causing the evacuation of any building, place of assembly, or facility of transportation. Therefore, according to King, threats that are overheard should not be treated as separate violations of the statute.

The State's argument in response takes a different route than the Court of Appeals' focus on the types of intent in the statute. The State contends the unit of prosecution should be the target of the threat, whether multiple individuals, one individual, or a structure. The State argues that because the purpose of the statute is to prevent serious alarm for personal safety, the nature of the conduct proscribed should be the reception and perception of the threat. This argument focuses on a statement in *Woolverton* that indicates the legislature's use of the word "communicated" means "the threat must be perceived and comprehended." *Woolverton*, 284 Kan. at 69. The State suggests this means there is a separate offense tied to each person who perceives and comprehends the threat.

Both the State's argument and the Court of Appeals' focus on intent fail to apply our holding that generally "the key is the nature of the conduct proscribed." *Schoonover*, 281 Kan. at 472. The nature of the conduct prohibited by all three subdivisions of K.S.A. 21-3419 is defined in the first five words of the statute: "A criminal threat is any threat." Subsection (1) adds an element to the conduct requirement—the threat must be communicated. As the State indicates, the term "communication" means someone must perceive and comprehend the threat. *Woolverton*, 284 Kan. at 69. Yet, as we stated in *Gunzelman*, 210 Kan. at 486, "[t]he wording of the statute appears sufficient to proscribe such threats whether directed generally against one or more persons and regardless of the purpose which the terrorist has in mind to accomplish." In other words, if the threat is communicated to more than one person, that is incidental; the elements of K.S.A. 21-3419(a)(1) would be met even if just one person was victimized. Neither the object of the

threat nor the number of people perceiving the threat changes the nature of the conduct.

Further, the intent requirement—that the threat must be made "with intent to terrorize another; or to cause [an] evacuation . . . ; or in reckless disregard of the risk of causing such terror or evacuation"—does not change the unit of conduct, the communicated threat. K.S.A. 21-3419(a)(1). The structure of K.S.A. 21-3419 also suggests that the legislature did not intend to define the unit of prosecution by intent; instead, the legislature divided the statute by the nature of the threat. See *Sprung*, 294 Kan. at 310 (finding that had the legislature intended to make a separate unit of prosecution when the offender touches the child and when the child touches the offender, the legislature could have explicitly done so); *Thompson*, 287 Kan. at 246-52 (finding that had the legislature intended to make possession of each substance listed in K.S.A. 65-7006[a] a separate offense, the legislature could have explicitly stated this in the statute).

As our discussion suggests, in K.S.A. 21-3419(a)(1) the legislature has not clearly and unambiguously authorized a separate conviction for each victim. As such, we must apply the rule of lenity. See *Bell*, 349 U.S. at 83; *Pham*, 281 Kan. at 1248; *Schoonover*, 281 Kan. at 471. Under that rule, as previously noted, we must presume that the unit of prosecution defined in K.S.A. 21-3419(a)(1) is a single communicated threat; a communicated threat constitutes only one offense even if it is perceived and comprehended by multiple victims. See *Pham*, 281 Kan. at 1248.

In this case, King made one threat—get off "his" property or else he would shoot. Regardless of his intent or the number of people who perceived the threat, he can only be sentenced for one offense and his sentences for three offenses violates double jeopardy. See *Thompson*, 287 Kan. at 244 (double jeopardy prohibits multiple *punishments* for a single offense); *State v. Winters*, 276 Kan. 34, 42-43, 72 P.3d 564 (2003) (in cases of multiplicitous convictions, "the defendant should be sentenced only on the more severe offense"). Although the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights protect against multiple pun-

ishments, King does not just ask us to vacate his sentences; rather, he asks us to reverse two convictions. See, *e.g.*, *Sprung*, 294 Kan. at 311 (affirming one conviction and reversing and vacating the second after finding convictions were multiplicitous). The parties do not discuss the appropriate remedy in this case. And it is not necessary for us to resolve this question because of the related error that clearly affects those convictions.

That error occurred when the trial court erroneously answered the jury's question asking, in essence, whether there could be multiple convictions if several people were in the vicinity when King uttered the threat. Because we have concluded that the unit of prosecution under K.S.A. 21-3419(a)(1) is a single communicated threat, we also conclude the trial court abused its discretion when it answered this question with a "yes." See *State v. Murdock*, 286 Kan. 661, 680, 187 P.3d 1267 (2008) (response to a jury's request for additional information during deliberations is reviewed for an abuse of discretion); see also *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (discretion is abused when guided by an erroneous legal conclusion), *cert. denied* 132 S. Ct. 1594 (2012).

It is apparent that this erroneous answer affected two of King's convictions and, in turn, exposed him to a violation of his rights under both the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. As a result, we apply the federal constitutional harmless error standard. Upon our review of the entire record, we conclude there is a reasonable possibility the trial court's answer changed the outcome on at least two counts of criminal threat. See *Ward*, 292 Kan. at 569 (defining constitutional harmless error standard). Hence, we reverse two criminal threat convictions—the second and third of these counts—and the corresponding sentences, which were concurrent with the sentence for the other count of criminal threat.

The final question is whether these errors—the multiplicity of counts and the trial court's erroneous legal conclusion regarding the unit of prosecution—and the previous error—the procedural error related to the jury's inquiry about intent—affect King's remaining (the first) criminal threat conviction. In making this as-

sessment, we apply the constitutional harmless error standard because one of the errors involves the constitutional right of a defendant to be present at all critical stages of the trial. After doing so, we conclude there is not a reasonable possibility that the errors affected the first criminal threat conviction. The procedural error regarding the jury's inquiry about intent did not result in a lack of accurate information being given to the jury. The court provided the jury with appropriate definitions of the words "terriorize" and "threat." While the court's answer would have been clearer if it had simply referred the jury back to the intent instruction, the court gave the jury the necessary information. The other errors relating to the unit of prosecution affect only the second and third criminal threat convictions. If anything, our analysis confirms that one charge was appropriate. Hence, we affirm one of King's convictions for criminal threat.

## DENIAL OF RIGHT TO UNANIMOUS VERDICT

Next, King argues the trial court violated his right to a unanimous verdict because the State introduced evidence of multiple acts which individually could have constituted the crime of felony criminal damage to property and the jury was not given a unanimity instruction.

The criminal complaint/information charged King with two counts of criminal damage to property, one a misdemeanor and one a felony. The misdemeanor charge in count IX charged King with damaging Kelly's van. The felony charge in count II charged King with damaging his father James' vehicles, "a 1990 Chevy Van and [a] 1966 El Camino." King focuses on count II, charged as a severity level 9 nonperson felony under K.S.A. 21-3720(b)(2) (Furse 1995) (damage in excess of $500). He contends that a unanimity instruction was required because two separate acts could have supported the charge: One when the white flatbed truck first rammed into the van and the second when the truck returned and hit the El Camino. In response, the State contends this is not a multiple acts case.

When a case involves multiple acts, the jury must be unanimous in finding which specific act constitutes the crime. See K.S.A. 22-

3421; *State v. Trujillo*, 296 Kan. 625, 629-32, 294 P.3d 281 (2013); *State v. Wright*, 290 Kan. 194, 201, 224 P.3d 1159 (2010); *State v. Voyles*, 284 Kan. 239, 244-45, 160 P.3d 794 (2007); see also *State v. Sanborn*, 281 Kan. 568, 569, 132 P.3d 1277 (2006) ("A unanimity instruction is used when the State charges one crime but relies on multiple acts to support that one crime."). To ensure unanimity in such cases, the trial court must give the jury a unanimity instruction, or the State must elect the particular act it relies on for conviction. See *Voyles*, 284 Kan. at 244-45.

The record on appeal does not contain a transcript of the jury instruction conference or the parties' discussion of proposed instructions, but King acknowledges that he did not request a unanimity instruction during the trial and is raising this issue for the first time on appeal. Where an instruction was not requested during the trial, an appellate court applies a clearly erroneous standard of review. K.S.A. 22-3414(3). Recently, in *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012), this court set out the analytical framework to be applied when a claim of error is based on the failure to give a jury instruction that was not requested at trial. In that decision, after recognizing the framework for such an analysis is guided by K.S.A. 22-3414(3), we noted that past applications of the statute had conflated the determinations of appellate reviewability, error on the merits, and reversibility of the error. In an attempt to differentiate those analytical steps, *Williams* stated:

"[T]o determine whether it was clearly erroneous to give or fail to give an instruction, the reviewing court would necessarily have to first determine whether it was erroneous. In other words, to determine whether the claim of error is properly reviewable, the court must first determine whether there is an error, *i.e.*, perform the merits review in the second step of the normal appellate process. That review for error necessarily presents a legal question subject to unlimited review.

"Only after determining that the district court erred in giving or failing to give a particular instruction would the reviewing court engage in the reversibility inquiry. Given that it has been utilized for decades, the current definition of clearly erroneous sets up the test to determine whether the instruction error requires reversal, *i.e.*, whether the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. This assessment of whether there has been injustice would involve a review of the entire record and a de novo determination. *Cf. State v. Ward*, 292 Kan. 541, Syl. ¶ 8,

256 P.3d 801 (2011) (harmless error analysis performed de novo), *cert. denied* 132 S. Ct. 1594 (2012)." *Williams*, 295 Kan. at 515-16.

We further explained how to conduct the first step of the analysis when the issue is whether it was clearly erroneous to fail to give a lesser included offense instruction, stating: "[W]e must necessarily look first at whether it was legally and factually appropriate for the district court to give a lesser included offense instruction." *Williams*, 295 Kan. at 521 (citing *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]). When an appellate court considers the legal appropriateness of an instruction "appellate review is unlimited, as with all questions of law." *Plummer*, 295 Kan. at 161. With regard to the second step of analysis, we further explained "[t]he party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5.

Subsequently, in *Trujillo*, we applied *Williams* in the context of a trial court's failure to give a unanimity instruction in a case involving multiple acts—the situation King alleges exists in this case. In doing so, we recognized our 2007 decision in *Voyles* had established a similar but slightly different multi-step framework specific to the failure to give a unanimity instruction. We summarized the *Voyles* framework by stating:

"The threshold question in the *Voyles* framework, over which the court exercised unlimited review, was whether the case truly involved multiple acts, *i.e.*, whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary. *Voyles*, 284 Kan. at 244.

"The second step in *Voyles* was a determination of whether an error occurred. If the State did not inform the jury which act to rely upon during its deliberations and the trial court did not instruct the jury that it must be unanimous about the particular criminal act that supported the conviction, there was error. *Voyles*, 284 Kan. at 244-45; see also *State v. Colston*, 290 Kan. 952, 968, 235 P.3d 1234 (2010).

"The final step in *Voyles* was to determine whether the error was reversible. After considering several alternatives, *Voyles* determined that the 'clearly erroneous' provision of K.S.A. 223414(3) should apply. *Voyles*, 284 Kan. at 245-47. *Voyles* opined that a district court's failure to instruct on unanimity was reversible under the clearly erroneous standard unless the defendant had presented a unified defense or a general denial of all of the acts, specifically explaining:

'If there is no unified defense, we do not tolerate verdict uncertainty in these cases. Stated in the language of the clearly erroneous standard of

review applicable when no unanimity instruction has been requested, cases not containing a unified defense are reversed because the reviewing court is firmly convinced that there is a real possibility the jury would have returned a different verdict if the instruction had been given.' 284 Kan. at 253." *Trujillo*, 296 Kan. at 629-30.

In *Trujillo*, we next compared the *Williams'* and *Voyles'* analytical structures and concluded the two were consistent, although some modification of *Voyles* was necessary to avoid confusion. We explained:

"The framework in *Williams* is not significantly different from the *Voyles* progression. One must necessarily perform the first two steps of *Voyles*—determining if the case involves multiple acts and if an error was committed because of a failure to elect or instruct—in order to establish that the failure to give the unanimity instruction was erroneous, as required by the first step in the *Williams* analysis. Then, both paradigms move to a clearly erroneous reversibility inquiry that uses a result-oriented test. *Voyles* stated the test as 'the reviewing court is firmly convinced that there is a real possibility the jury would have returned a different verdict if the instruction had been given.' 284 Kan. at 253. *Williams'* version was 'whether the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' 295 Kan. at 516. We do not discern a practical difference between the stated tests, and therefore, we opt to omit the 'real possibility' language to avoid any confusion with the constitutional harmless error test we set forth in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S.Ct. 1594 (2012) (constitutional harmless error standard paraphrased as 'where there is no reasonable possibility that the error contributed to the verdict')." *Trujillo*, 296 Kan. at 631.

This combined *Williams/Voyles* framework guides us in our analysis of King's argument.

*Step 1 of* Williams' *Test—Was a Unanimity Instruction Legally and Factually Appropriate?*

In addressing the first step of whether a unanimity instruction was legally and factually appropriate, the threshold question involves an examination of the defendant's conduct to determine if the alleged acts are separate and distinct from one another or part of a single continuous course of conduct. If the incidents in question are not legally or factually separate, there are not multiple acts. *Voyles*, 284 Kan. at 244-45; *State v. Schoonover*, 281 Kan. 453, 506, 133 P.3d 48 (2006); see *State v. Jones*, 295 Kan. 1050, Syl. ¶

3, 288 P.3d 140 (2012) ("When several acts are alleged, any one of which could constitute the crime charged, the court is presented with a multiple acts case that requires the jury to be unanimous as to which one of the acts the defendant committed."). Whether a case presents a multiple acts issue is a question of law over which this court has unlimited review. *Trujillo*, 296 Kan. at 629; *Schoonover*, 281 Kan. at 506. Answering this question requires application of the first two prongs of the *Voyles* test. *Trujillo*, 296 Kan. at 631; *Voyles*, 284 Kan. at 252.

- *First Prong of* Voyles' *Multiple Acts Test—There Were Multiple Acts*

Under the first prong of the *Voyles'* multiple acts test, we determine whether the conduct was unitary—that is, whether King's conduct was part of one act or represents multiple acts that are separate and distinct from one another. Four factors assist in analyzing this prong: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *Schoonover*, 281 Kan. at 507.

Here, King allegedly rammed the white flatbed truck into two of his father James' vehicles. The State acknowledges in its appellate brief that the damage to James' vehicles was caused during two "separate incidents." But the State also argues that both the van and the El Camino were damaged during "both incidents," there was no intervening event between the two incidents, and the conduct was motivated by the same impulse—King's desire to have James evict Kelly. To support these arguments, the State cites *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005), a case involving aggravated kidnapping and other crimes, where this court held there were not multiple acts. Additionally, the State contrasts *Kesselring* and the facts of this case with the facts in *Voyles*.

In *Kesselring*, the kidnapping was a continuous incident that could not be factually separated despite the fact that the event transpired over several hours, the victim was moved from one lo-

cation to another, and the victim was momentarily free during an attempted escape. In contrast, in *Voyles*, 284 Kan. 239, the defendant was convicted of eight crimes involving two different victims and many different locations over several months. The State contends this case is more akin to *Kesselring*.

The Court of Appeals disagreed, and so do we. As the Court of Appeals accurately stated:

"The two times that the truck ran into James' vehicles are separate and distinct acts. Although they occurred at the same location, 5 to 10 minutes elapsed between the events, intervening events existed while King was at Kelly's house, and King arguably had a fresh impulse to return and hit the vehicles again after leaving the first time. But it is unclear whether both the van and the El Camino were damaged during each incident so that either act could support the crime charged—damaging both vehicles.

"[The eyewitness] testified that the truck ran into James' van on the first incident. She said that it hit the van three times and then on the third hit, the van hit the El Camino and moved it over. [She] further testified that when the truck returned, it started hitting the other vehicles that it had moved over. James said that just the van was hit during first incident and that the van and the El Camino were hit during the second strike. Because of this uncertainty, the jury could have likewise been unsure about whether both vehicles were damaged in each incident. Thus, this case should be treated as a multiple-acts case." *State v. King*, No. 99,479, 2010 WL 3488659, at °11 (Kan. App. 2010) (unpublished opinion).

- *Second Prong of* Voyles' *Multiple Acts Test—The Trial Court Erred*

This means a unanimity instruction was legally and factually appropriate unless the State elected, either explicitly or functionally, the particular criminal act upon which it relied. *Voyles*, 284 Kan. 239, Syl. ¶ 2. The State did not make this election and, in its brief on appeal, concedes that if this case is ruled a multiple acts case, a unanimity instruction should have been given.

*Step 2 of* Williams' *Test and Third Prong of* Voyles' *Multiple Acts Test—Reversal Is Appropriate*

Moving to the final step in the analysis under both *Williams* and *Voyles*, this court must determine whether the error was reversible. See *Trujillo*, 296 Kan. at 631; *Williams*, 295 Kan. 506, Syl. ¶ 5; *Voyles*, 284 Kan. at 253. As we held in *Trujillo*, the test is " 'whether the reviewing court is firmly convinced that the jury would have

reached a different verdict had the instruction error not occurred.' [*Williams*], 295 Kan. at 516." *Trujillo*, 296 Kan. at 631.

The State argues that even if this is a multiple acts case, there is no reversible error because King presented a unified defense. See *Voyles*, 284 Kan. 239, Syl. ¶ 5. On the other hand, King argues he did not present a unified defense. He notes that in his trial testimony, he claimed he did not know how James' van was damaged. And King blamed Shawn for the damage to the El Camino. King testified that Shawn drove the white flatbed truck, and, although King was a passenger at the time, it was Shawn who ran the truck into the El Camino.

The Court of Appeals agreed with the State, noting that although King identified a specific person who allegedly hit one of the two vehicles, he generally denied being involved in both incidents. See *King*, 2010 WL 3488659, at *12. The Court of Appeals reasoned that the jury did not believe King's assertion of innocence and, "[b]ecause the jury rejected King's version of the events that he was not involved, there is no real possibility that it would have returned a different verdict if the unanimity instruction had been given." *King*, 2010 WL 3488659, at *12. In contrast to the Court of Appeals, we cannot dismiss the differences in King's testimony regarding the first and second incidents. We reiterate a point made in *Trujillo*: The presentation of a unified defense or general denial to any of the multiple acts "is merely an important and compelling factor in firmly convincing the reviewing court that the jury would have reached a different verdict had the instruction error not occurred." *Trujillo*, 296 Kan. at 631. The presentation of a unified defense or a general denial does not foreclose reversible error in a multiple acts case, however.

For example, while in *Voyles* we specifically looked at whether the defendant had presented a unified defense or a general denial to any of the multiple acts, we also stated that inconsistencies in the victims' testimony could lead to jury confusion and lack of unanimity even though the defendant generally denied any wrongdoing. *Voyles*, 284 Kan. at 253-55. The same can be true when other evidence presents inconsistencies that distinguish between two or more incidents. In such a case, if the defendant failed to request

a unanimity instruction, an appellate court must review the record as a whole to determine if it is firmly convinced that the jury would have reached a different verdict had the error not occurred. See *Trujillo*, 296 Kan. at 630; *Williams*, 295 Kan. at 516.

In this case, a review of the record leads us to the conclusion that inconsistencies in the evidence could have led to jury disagreement and confusion regarding who was responsible for the two separate acts of hitting James' vehicles. King provided a partial explanation for the first incident, blaming the damage on Shawn's careless driving. But he did not provide an explanation for how the second incident occurred. Further, there was a discrepancy in the evidence regarding whether both vehicles or only one was damaged during the first incident, and King did not provide an explanation for how both vehicles were damaged. Obviously, it is not his burden to provide these explanations. Nevertheless, the end result was a discrepancy in the evidence and a lack of anything in the record from which the jury could infer a motive for Shawn to return to James' house to further damage the vehicles during the second incident. As a result, the jury could have believed King's testimony regarding the first incident but found he was the one who drove the truck into the El Camino and van during the second incident. Further, individual jury members may have viewed each incident differently and could have disagreed among themselves regarding what evidence was credible.

Consequently, in light of the record as a whole, we are firmly convinced the jury would have reached a different verdict had the instruction error not occurred. As a result, we reverse King's felony conviction for criminal damage to property as charged in count II.

## *ALLEN*-TYPE INSTRUCTIONAL ERROR NOT REVERSIBLE

King also challenges the language in a deadlocked jury instruction, a modified *Allen*-type instruction, given along with other instructions before jury deliberations began. See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). The instruction informed the jury that the need for a second trial would be a "heavy burden on both sides" and that there is no reason to believe another jury would be better situated to decide the case.

In *State v. Salts*, 288 Kan. 263, 266-67, 200 P.3d 464 (2009), we held this language was erroneous.

Nevertheless, because King admits he did not object to the instruction, he must establish clear error. See K.S.A. 22-3414(3); *Williams*, 295 Kan. 506, Syl. ¶ 3. This means he has the burden of firmly convincing us the jury would have reached a different verdict had the jury not been erroneously instructed. See *Williams*, 295 Kan. at 516. The Court of Appeals held King had not met this burden. *King*, 2010 WL 3488659, at *12.

Before us, King argues the instruction was clearly erroneous because the jury asked the court to read back testimony from Katie, Amanda, and Shawn relating to the criminal threat charges and also asked two questions seeking clarification of the law regarding criminal threat. In addition, he again points to the word "undecided" that was written on the verdict forms for two of the criminal threat counts. The significance of the request for readback and jurors' possible indecision, if any, is mitigated because we have already decided these two criminal threat convictions must be reversed. Further, although the jurors asked for clarification relating to criminal threat, they never indicated they were deadlocked.

King also argues there was "inconsistent" evidence regarding the remaining charges for which he was convicted—arson, one count of criminal threat, misdemeanor criminal damage to property, assault, battery, and domestic battery. Yet, the only specific evidence mentioned by King relates to the arson charge; he notes that no one saw him physically light the fire and that the forensic tests for ignitable fluids came back negative. He ignores considerable evidence against him. Both Kelly and Katie testified to seeing King walking back and forth from the shed where gas cans were stored to the house approximately 5 to 10 minutes before the house caught on fire. Minutes after the fire started, Kelly saw King run from the house and drive off in Kelly's van. Kelly's testimony was corroborated by Katie, who also saw King fleeing the scene shortly after the fire started. Kelly also testified to seeing King pull a lighter out of his pants pocket earlier that evening. In addition, Kelly's aunt testified to her telephone conversation with King that night in which he said that it was his house and he would burn it down

if he wanted to. Finally, Kansas City Fire Chief Jim Long testified the fire was started intentionally, not accidentally, and a forensic chemist testified it is not uncommon to receive negative test results when testing for ignitable fluids in an arson case.

After a review of the record, we are not firmly convinced the jury would have returned a different verdict on those convictions we have not already reversed had the *Allen*-type instruction not been given. The instruction was not clearly erroneous.

## THE ERRORS DID NOT CUMULATIVELY RESULT IN AN UNFAIR TRIAL

In his final attack on his convictions, King argues that even if any error does not individually require reversal of his convictions, the cumulative impact of the alleged errors was an unfair trial and his convictions must be reversed.

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

In this case, because the right to be present during all critical stages of a trial is a right guaranteed by the United States Constitution, we must determine there is no reasonable possibility these errors combined to contribute to the verdict. See *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 (2013) (constitutional harmless error standard applies when jury's question is answered outside defendant's presence); *State v. Ward*, 292 Kan. 541, 578, 256 P.3d 801 (2011) (explaining constitutional harmless error standard), *cert. denied* 132 S. Ct. 1594 (2012).

"In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the trial court dealt with the errors as they arose, including the efficacy, or lack of efficacy, of any remedial efforts; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *State v. Warrior*, 294 Kan. 484, 517, 277 P.3d 1111 (2012).

"Reversal for cumulative error is not required if the evidence against a defendant is overwhelming." *State v. Parks*, 294 Kan. 785, 804, 280 P.3d 766 (2012) (citing *State v. McCaslin*, 291 Kan. 697, 732, 245 P.3d 1030 [2011]); *State v. Colston*, 290 Kan. 952, Syl. ¶ 15, 235 P.3d 1234 (2010) ("No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant.").

In this case, in weighing the impact of the errors, it is significant that we have determined that two criminal threat convictions and the felony criminal damage to property conviction must be reversed. By doing so, we have cured the errors that led to those convictions. And these errors—an improper instruction to the jury regarding the unit of prosecution under the criminal threat statute, double punishment because of multiplicitious criminal threat convictions, and the need for a unanimity instruction because of multiple acts of felony criminal damage to property—do not infect the other convictions. That leaves two errors for our cumulative error analysis: The trial court's failure to answer a jury question in open court and the trial court's improper instruction to the jury regarding the impact of a deadlocked jury.

Examination of these remaining errors in the context of the record as a whole convinces us they were relatively insignificant and bore no relationship to each other. Given this and the strong evidence against King, we conclude it is unlikely the errors contributed to the verdict.

## SENTENCE DOES NOT VIOLATE *APPRENDI*

Finally, King contends the use of his prior convictions in his criminal history score to enhance his sentences without requiring the history to be included in the complaint and proved to a jury beyond a reasonable doubt violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). King acknowledges that this court has previously rejected this argument. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). The Court of Appeals correctly found no merit to King's contention. See *King*, 2010 WL 3488659, at *13. King

has not presented a new or persuasive argument compelling us to vary from our precedent.

## CONCLUSION

We affirm King's convictions for arson, one count of criminal threat, misdemeanor criminal damage to property, assault, battery, and domestic battery. We reverse his convictions and vacate his sentences for two counts of criminal threat and for felony criminal damage to property.

Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part.