NOT DESIGNATED FOR PUBLICATION

No. 122,222

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARQUAILE MARTINIQUE WALKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed June 25, 2021. Affirmed.

*Richard Ney*, of Ney, Adams & Miller, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL, J., and MCANANY, S.J.

PER CURIAM: Claiming several trial and jury instruction errors, Marquaile Walker asks us to overturn his convictions for attempted intentional second-degree murder, aggravated battery, and criminal threat. Walker shot a man after an argument at the courthouse in Wichita. Our review of the record leads us to hold that none of his claimed errors are reversible. We affirm his convictions.

1

*An argument at the courthouse led to a shooting later at an apartment.*

There is no dispute about what happened at the courthouse. Walker was there for a hearing on a contempt action that he had filed against Erika Davenport. They have a daughter. He alleged she was not abiding by the parenting plan. A local court rule required Walker's attorney to consult with Davenport before the hearing, so they stepped out of the courtroom. Walker eventually followed them.

Robert Pryor, who lives with Davenport, had driven her to the hearing. He was initially waiting outside because they had also brought two children with them. Davenport called Pryor because she did not know who to contact to ensure she and Walker exchanged their daughter in a public place. Neither she nor Pryor wanted Walker to come to their apartment. When Pryor came into the courthouse and approached Davenport, Walker, and Walker's attorney, he told Walker that "[y]ou're not going to come to my house to pick up the child." Walker responded that he would pick his daughter up where he pleased.

The argument escalated. According to a security officer, the argument was heated but not physical. The officer stepped between Walker and Pryor to avoid a fight. Pryor said, "You're not coming to my house. I've been in prison for hitting little assholes like you." Walker responded, "If my child is over there, I'll come over there, and I'll kick your ass." Pryor admitted that he told Walker that he had been in prison for 10 years, and, if Walker "messed" with him, Pryor would "take care of it."

Walker told Davenport, "I know where you stay . . . I got something for you," and "I've got two bitches for you." According to Davenport, that meant that Walker would get two women to come over and beat her up. Walker then told Pryor that he "had something for him, too." Those two statements—one made to Davenport and one made to Pryor— are the basis of Walker's criminal threat charge.

2

After the argument ended and the parties were separated and escorted out, Pryor told the supervisor of courthouse security that he was upset that Walker had been given his address because he "felt like he was in danger . . . because he's going to come over and it's going to be a problem. He's going to hurt somebody."

Pryor and Davenport left the courthouse and drove back to their apartment. Pryor was hungover and had been sick to his stomach on the way back. When Pryor parked at their apartment, he remained seated in the car with the door open because he thought he would be sick again. Davenport took the two children into the house. She intended to come back out to attend to Pryor.

From this point, Walker's account differs from the versions given by Davenport and Pryor. We begin with Pryor's version.

Pryor testified that about 30 seconds after Davenport went inside their apartment, as Pryor was sitting indisposed in the driver seat, he heard several shots and his windshield shattered. Pryor got out of his car and ran towards a nearby park. As he was running, bullets struck him in the back of the chest and back of the neck. After the shots stopped, Pryor walked back and found Davenport, who went to get something to put pressure on his wounds.

Davenport did not appear at trial. After she was arrested on a material witness warrant, she testified while in jail clothing. She told the jury that after she put the girls inside, she returned to help Pryor. This was 20-30 minutes after the courthouse argument. Back at the car, she saw Walker pull up in a car, hit another car as he jumped out, yell at Pryor, and then shoot at the car with a handgun. Walker continued to shoot at Pryor as Pryor fled towards a field. Walker then hopped back in his car and sped off. Davenport called police when Pryor returned because she saw he had been shot.

3

Walker's account is much different. After leaving the courthouse, Walker says that he got gas and then drove over to Davenport's because Davenport wanted to see their daughter and they had arranged for the three of them to go to a park and get ice cream. Walker was not sure exactly where in the complex Davenport lived, but after he parked, he saw Davenport and the two children walking inside. When he called to her, she raised her hand in acknowledgment then went inside.

Walker then heard Pryor ask what he was doing there and noticed Pryor sitting in his car. Pryor said to Walker, "You think you're tough, but I can tell [you're not]" and "you think I'm a game, and I'm going to show you I'm not." Walker felt threatened, so he grabbed his gun, and after he saw Pryor digging in his car, Walker fired several shots at the windshield. When Pryor got out of the car, it looked like he had something in his hand, possibly a gun, and was gesturing like he would shoot Walker. Walker thought his life was in danger, so he fired several more shots and then jumped back in his car and drove off.

The jury found Walker guilty of the lesser included crime of attempted intentional second-degree murder, aggravated battery, and criminal threat. The court sentenced Walker to 104 months in prison.

Walker raises seven issues on appeal.

1. His constitutional rights were violated by the district court's ex parte communications with a juror it dismissed, and the court did not have reasonable grounds to dismiss the juror.
2. The district court erred when it allowed testimony by Davenport that she had not initially testified because someone had texted her that she would lose custody of her child if she did.

4

3. The prosecutor erred during closing arguments by vouching for the credibility of a witness.

4. Two of his convictions are multiplicitous, meaning he is being punished multiple times for the same crime.

5. Because he made two distinct threats, it is possible the jury did not unanimously agree about which of them constituted a criminal threat so the court should have given the jury a unanimity instruction.

6. Insufficient evidence supports his criminal threat conviction because the State failed to prove that he intended to put Davenport or Pryor in fear.

7. The district court erred by giving an instruction on permitted use of force by an initial aggressor.

We will address the issues in that order.

*Before the jury is sworn, the court replaced one of them.*

After the court told the selected jurors to return the next morning by 9:30 for the start of the trial, juror P.A. told the judge's aide that she needed to speak to her. The aide spoke to P.A. in the hallway then explained the conversation to the parties on the record. P.A. said that she had to take her mother to a long-planned and important eye appointment at 8:30 the next morning. P.A. said the appointment could take a couple of hours. P.A. also said that she had worked the previous night shift, had not slept, and had to go straight to work for another night shift.

The judge asked the attorneys how they would like to proceed. The State said it would have struck P.A. if it had known about her working night shifts and not sleeping. Walker's attorney said that he did not want P.A. removed and that they would just have to address the issue if it arose the next day. P.A. was waiting in the hallway, but neither party asked to have her speak. The court told his aide to tell P.A. that she needed to get

5

there as soon as she could after the appointment. The court also said that it would try to contact her employer and tell them that P.A. needed to be a juror the next day. The State did not want a juror who had not slept for 48 hours. The court then adjourned for the evening.

Just as she had told the judge's aide, P.A. did not appear on time for trial the next morning. The court said that P.A.'s supervisor had told it that morning that P.A. had worked the night shift and then left early to take her mom to the doctor. The court said that it did not know how long P.A. would be at the appointment. The State suggested that the court remove P.A. from the jury and replace her with the one alternate that had been selected. It did not want somebody who had not slept in 48 hours as a juror and suggested that they needed to get on with the trial since they were already 30 minutes behind, and the court's library was filling up with witnesses. Walker's counsel said that information about P.A.'s lack of sleep was speculative and he objected to having her replaced without hearing from her.

The court excused P.A. over the defense's objection. It gave three reasons. First, it found that P.A. would be "physically infirm to the point of being unable to do the task" based on her work schedule and lack of sleep. Second, it found that making P.A. serve would create an extraordinary hardship or compelling personal hardship. Third, it said that P.A. was not present and it had no idea when or if P.A. would show up for the trial. The court ordered the alternate juror to be seated with the jury.

Because the court had selected an alternate juror, there were still 12 jurors to hear the case and reach a verdict. The court brought in the remaining jurors, swore them in, and started the trial. P.A. was never sworn in as a juror.

To us, Walker raises two challenges. First, he argues that his constitutional and statutory due process rights were violated because he was not present for the juror's ex

6

parte communication with the court. Second, he argues that the district court lacked reasonable cause to remove the juror.

Walker's arguments would carry more weight if P.A. had been sworn as a juror and the trial had started. She was a potential juror who failed to appear and was replaced by an alternate who was selected according to law. What has Walker lost from this action by the court?

The record does not show the sort of ex parte communication between the juror and judge that would raise constitutional concerns, such as a private meeting in chambers for a conference. Juror P.A. pulled the judge's aide aside as the selected jurors were leaving the courtroom. Both parties were present. And the district court notified them that the aide would speak to P.A. Afterwards, the aide returned and explained the situation. Walker had the chance to question the aide. The aide also informed the parties that P.A. was still in the hallway. Walker declined to seek more information or to have P.A. brought in to learn more.

Based on that, it is hard to understand Walker's objection the next day—and now on appeal—that dismissing the juror without hearing more from her deprived him of the opportunity to be present at a critical stage of his criminal proceeding. Walker did have that opportunity, but he did not take it.

His second argument is that the court lacked reasonable cause to remove P.A. Under K.S.A. 2020 Supp. 22-3412(c), a judge may empanel an alternate juror when he or she finds that a juror is unable to perform their duties. Thus, a district court's decision to discharge a juror and substitute an alternate juror is reviewed for abuse of discretion. It is the defendant's burden to establish an abuse of discretion. *State v. Hilt*, 299 Kan. 176, 186, 322 P.3d 367 (2014). A judicial action constitutes an abuse of discretion if the action is

7

- arbitrary, fanciful, or unreasonable;
- based on an error of law; or
- based on an error of fact.

*State v. Hilt*, 307 Kan. 112, 121, 406 P.3d 905 (2017).

P.A. did not appear for the start of the trial. It is not an abuse of discretion to replace a dismissed juror with an alternate when "reasonable cause" exists. *Hilt*, 307 Kan. at 121-22. And reasonable causes exists if a juror becomes ill, incapacitated, is affected by personal problems, or is otherwise unable to perform their duty. 307 Kan. at 121-22. The district court had reasonable cause to replace P.A. After all, an absent person is unable to perform the duties of a juror.

The court here did not abuse its discretion. While the court may have relied on unconfirmed facts when it found that P.A. would be physically infirm based on lack of sleep, it also gave another reason for excusing P.A. It found that P.A. was not present and no party knew when or if she would ever appear. What was the court to do at that point? The trial had been delayed that morning and witnesses had arrived at the courthouse. So, because she was not even there, P.A. could not perform her duties. Under those circumstances, a reasonable person could agree with the district court that it should excuse P.A., before the jury was even empaneled, and rely on the alternate juror. We cannot find fault here when the court made a practical decision to select the alternate juror and start the trial. We hold that this is not reversible error.

*Davenport explained why she was wearing jail clothing.*

For this issue, we focus on a brief exchange between the prosecutor and Davenport. At trial, the State asked Davenport if she had not showed up to testify the day before because she had received a text about her child. She said yes.

8

"Q. Gotcha. Counsel wanted to talk about your orange jumpsuit.

"A. Yeah.

"Q. And you didn't show yesterday for court.

"A. Yes, sir.

"Q. You—as far as your daughter that you have with Mr. Walker, does his mother have custody of your daughter?

"A. Um-hmm, yes.

"Q. And were you in our office a couple of weeks ago?

"A. Yes.

"Q. When you were in our office a couple of weeks ago, did you express concern about coming and testifying?

"A. Yes.

"Q. Were you told—

"MR. SYLVESTER: Objection to hearsay, Your Honor.

"MR. MUTH: I'm not offering for the truth of the matter asserted. I'm offering to show why she didn't show up yesterday.

"THE COURT: Overruled.

"BY MR. MUTH:

"Q. Were you told that you wouldn't get your daughter back if you had to come and testify?

"A. Yes."

Walker renews his argument on appeal that Davenport's statement was hearsay and the district court erred by allowing it.

Hearsay is evidence of a statement made by somebody other than the testifying witness that is offered to prove the truth of the matter stated. K.S.A. 2020 Supp. 60-460. Such evidence is inadmissible except as provided in K.S.A. 2020 Supp. 60-460. But the

9

dispute here is not about whether an exception applies; the parties dispute whether the statement is hearsay at all.

Davenport's testimony is not hearsay. We hold that the court did not err by admitting it. Davenport testified that someone—Davenport did not name them—had sent her a text saying that she would not get her daughter back if she testified. The State introduced that evidence only to explain why she had not appeared to testify the day before after the defense had mentioned that Davenport was wearing jail clothes. The State did not introduce the testimony to prove Davenport had received that text, which would be the truth of the matter stated. This is not reversible error.

*The prosecutor did not vouch for a witness' credibility.*

Walker contends that during closing argument the prosecutor improperly commented on Davenport's and Pryor's credibility. He argues that the prosecutor was improperly vouching for Davenport's version of the events and thus committed prosecutorial error. When the prosecutor was discussing whether Davenport and Pryor had concocted their version of events and he said, "you know that that couldn't have happened."

A review of the law is helpful at this point. In general, prosecutors may not offer juries their opinions about the credibility of witnesses. Prosecutors have wide latitude, however, to craft arguments that include reasonable inferences to be drawn from the evidence. *State v. Sean*, 306 Kan. 963, 979-80, 399 P.3d 168 (2017). An example of a prosecutor who acted outside that wide latitude comes from *State v. Smith*, 28 Kan. App. 2d 56, 67-68, 11 P.3d 520 (2000), where the prosecutor said, "There is no doubt whatsoever that [the defendant] is a liar."

But a prosecutor does not act outside the wide latitude afforded if he or she merely observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial. *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011). In *Duong*, the prosecutor's explicit comments about a witness' credibility was not improper because they were reasonable inferences based on the evidence at trial and the prosecutor simply directed the jury to that evidence. See *Sean*, 306 Kan. at 979-80, (citing *Duong*).

Here, when we consider the prosecutor's statement in context, it becomes clear that the prosecutor is not vouching for Davenport or commenting on her credibility. Instead, the prosecutor argues that based on a 911 call recorded after the shooting, Davenport and Pryor did not have time to concoct a story before the police interviewed Davenport:

> "She told you everything that happened. The same thing she told the police approximately 29 minutes after the shooting. Do you think her and Robert spent time coming up with a story? Is that what you believe, that they came up with this? Because, ladies and gentlemen, you know that that couldn't have happened—why? Because you heard the young lady, the neighbor that's on the call. She's standing right there. Do you hear Robert and Erika talking? No. You hear Erika crying. She's crying. They're not conversing. They're not coming up with a story, ladies and gentlemen.
>
> "And then you know the cops are there. And the cops got them. They've got Robert. He's going with EMS—or the ambulance; right? And she is talking to the detectives 29 minutes later telling exactly what happened.
>
> "She came and told you the final thing last night: They weren't going on any ice cream social. They couldn't even stand each other. They couldn't stand each other. They had to have a place, her mother's house, to exchange the child. So when you're trying to determine the credibility of witnesses, ask yourselves: Do you really think this was an ice cream social that got canceled? Do you really think that Erika Davenport and this defendant was going to spend the evening together—or I guess the early morning together with their daughter, after the big explosion at the courthouse?"

11

In other words, the prosecutor was drawing a reasonable inference about witness credibility from other evidence introduced at trial, just as in *Duong*, 292 Kan. at 831-32. The law permits a prosecutor to do that. We hold that the prosecutor here did not err by making these remarks.

*According to precedent, there is no double jeopardy violation here.*

Walker contends that his convictions for attempted second-degree murder and aggravated battery are multiple punishments for a single offense. In other words, the two convictions violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. See *State v. Pham*, 281 Kan. 1227, 1246, 136 P.3d 919 (2006). A change in the law made by the Kansas Supreme Court compels us to reject this argument.

At one time in Kansas prosecutions, if a defendant committed a single violent act—such as a shooting or a stabbing—or committed a series of violent acts simultaneously—such as a beating and then a shooting, it was multiplicitous to charge both aggravated battery and attempted murder. For example, in *State v. Cathey*, 241 Kan. 715, 719, 741 P.2d 738 (1987), the court held, "Where there is only one victim and two acts of violence—a beating and a shooting—occurring at approximately the same time and place, the person who inflicts such injuries cannot be charged with both aggravated battery and attempted murder." Before that, in *State v. Turberville*, 235 Kan. 993, 995, 686 P.2d 138 (1984), the court held that "the charges of attempted murder and aggravated battery . . . arose out of the same overt act—the shooting of Art Butler. They are clearly multiplicitous."

But the Kansas Supreme Court disapproved of that single-act approach in *State v. Schoonover*, 281 Kan. 453, 493-498, 133 P.3d 48 (2006), when the court laid out a stricter framework for analyzing multiplicity issues. Under *Schoonover*'s two-step

analysis, the court first asks whether the multiple charges arise from the same conduct, considering such factors as

> "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497.

Then, if the acts do arise from the same conduct, the court then asks if, by statutory definition, there are two offenses or only one. For cases like this one, with multiple convictions of different statutes, the court uses the same-elements test. Under that test, the court asks whether each statute requires proof of an element that is unnecessary to prove the other offense. If so, then the statutes provide for separate offenses, and there is no double jeopardy violation. *Schoonover*, 281 Kan. at 497-98.

The same-elements approach is rigid. Simply put, its application here means that Walker was convicted of two severe crimes for exactly the same violent act. By shooting Pryor he committed two crimes. But the Kansas Supreme Court anticipated such criticism when it adopted the test. It found that the "logical, mechanical ease of application and, hence, certainty" of the same-elements approach was preferable to the single-act approach, which led to a "lack of predictability" and provided "broader protection than required by the Fifth Amendment of the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." *Schoonover*, 281 Kan. at 495. The Court continues to apply the strict framework of *Schoonover*, so we hold it governs this appeal. See *State v. Dale*, 312 Kan. 174, 184, 474 P.3d 291 (2020).

Walker's convictions satisfy the first step of the *Schoonover* analysis because both charges arose from him shooting Pryor. The parties instead focus on the second step—the elements test. Walker argues that the State necessarily had to prove aggravated battery to

13

prove attempted second-degree murder, so he contends that aggravated battery did not require proof of an element unnecessary to prove attempted murder. Because of that, he likens aggravated battery to a lesser included offense of attempted murder. The State insists that the statutes define distinct offenses.

It helps to set out the elements of each offense:

According to K.S.A. 2016 Supp. 21-5301(a) and 21-5403(a)(1), for attempted intentional second-degree murder, the jury was instructed that the State had to prove these four elements:

"1. The defendant performed an overt act toward the commission of murder in the second degree.
"2. The defendant did so with the intent to commit murder in the second degree.
"3. The defendant failed to complete the commission of murder in the second degree.
"4. This act occurred on or about the 19th day of July, 2016, in Sedgwick County, Kansas."

Then, under K.S.A. 2016 Supp. 21-5413(b)(1)(A), to prove aggravated battery, the jury was instructed that the State had to prove these two elements:

"1. The defendant knowingly caused great bodily harm to Robert Pryor.
"2. This act occurred on or about the 19th day of July 2016, in Sedgwick County, Kansas."

By following the *Schoonover* elements test, we see the statutes for attempted second-degree murder and aggravated battery define different crimes because each offense contains a distinct element. Attempted intentional second-degree murder requires an intent to kill, while aggravated battery does not. Aggravated battery requires a knowing infliction of great bodily harm, which attempted murder does not—after all, a

14

person could be guilty of attempted second-degree murder for shooting at a person and missing. This means that Walker's convictions were not multiplicitous and there is no double jeopardy violation.

*The court should have given a unanimity jury instruction. But is the error harmless?*

Walker next claims that because his statements to Pryor and Davenport were two distinct threats, it is possible the jury did not unanimously agree about which of them constituted a criminal threat. Walker told Davenport that "I got two bitches for you" and told Pryor that "I have something for you as well." He made these statements during the argument at the courthouse.

Because criminal jury verdicts must be unanimous, a problem arises when the State presents evidence of more than one act that could constitute one of the crimes charged. *State v. King*, 297 Kan. 955, 977-78, 305 P.3d 641 (2013). To remedy this problem, the State must either elect which act it relies on for a conviction or the trial court must give a unanimity instruction, which tells the jury that it must agree upon the specific act that constitutes each crime. 297 Kan. at 978. Neither happened here.

The State insists that the criminal threat charge involved just one unified act, so a unanimity instruction was not warranted.

We must use a three-step test when a defendant challenges a district court's failure to give a unanimity instruction. See *State v. Harris*, 310 Kan. 1026, 1039, 453 P.3d 1172 (2019). First, we determine whether the case involves multiple acts. Second, if the case does involve multiple acts, we consider whether an error occurred because the district court failed to give a unanimity instruction and the State failed to elect which act it was relying on. Third, if there was an error, we decide whether it requires reversal. 310 Kan. at 1039.

15

Looking at the first step, we must decide "'whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary.'" *Harris*, 310 Kan. at 1039. Four factors guide our analysis:

- whether the acts occurred at or near the same time;
- whether the acts occurred at the same location;
- whether an intervening event occurred between the acts; and
- whether a fresh impulse motivated some acts.

*Harris*, 310 Kan. at 1039.

Frankly, a heated argument such as the one that occurred here shows why a unanimity instruction should have been given. Which statement was the threat? The one to Davenport or the one to Pryor, or were both threats? To whom was the threat directed? Rational jurors could have chosen different statements. But the law requires a unanimous jury. It had to agree on which statement was the threat. Because the words Walker spoke were directed at two people and are distinct threats, we hold this is a multiple acts case.

We note that the way this count was charged, how the jury was instructed, and how the prosecution argued the evidence, forced this jury into a "pick one" choice. Count three of the information alleged that Walker unlawfully threatened to commit violence to Davenport and Pryor. Note there is one count, not two. Jury Instruction no. 13 told the jury that Walker threatened to commit violence and communicated the threat with the intent to place another in fear. Which person was placed in fear? The instruction does not say.

And during summation the prosecution argued that Walker told [Davenport], the mother of his child that "I got two bitches for you." And told Pryor, "I have something for you as well." This argument shows that the State did not elect to pick which statement it wanted to pursue as a crime. It was left for the jury to pick one. This means there is an

16

obvious possibility that one juror could pick one threat while another juror could pick the other as the crime. This is why it was error not to give the unanimity instruction. The parties can ask the jury to pick one, but it must also be told it must pick the *same* one. But we cannot end our analysis here.

We turn to the question—is this a reversible error? Reversal is required if "the reviewing court is firmly convinced that the jury would have reached a different verdict" had the court given a unanimity instruction. *King*, 297 Kan. at 980. Although the wording differs slightly, the Kansas Supreme Court has said that, in practice, this standard does not differ from the regular clear error test. 297 Kan. at 980.

It is important at this point to determine whether Walker presented a unified defense, meaning that he generally denied the multiple acts rather than raise a separate defense to each. See *King*, 297 Kan. at 983-84. If the defendant has not presented a unified defense, a reviewing court should reverse a conviction. On the other hand, reviewing courts generally find only harmless error when the defendant presents a unified defense. *State v. Voyles*, 284 Kan. 239, 253, 160 P.3d 794 (2007). The presence of a unified defense is not always dispositive, however. A court may still reverse if inconsistencies in the evidence could have led to jury disagreement and confusion and raised unanimity issues. *King*, 297 Kan. at 983-84.

Walker concedes that he presented a unified defense by arguing that although he made the statements, he did so in the heat of an argument and did not intend to put Pryor and Davenport in fear. There were no inconsistencies in the record that could have confused the jury. Walker did not dispute that he made the statements, so the jury had to either accept or reject Walker's argument about intent. The jury rejected that defense. We see no reason to conclude that, but for a unanimity instruction, the jury would have accepted that defense and reached a different verdict.

17

Walker is right to complain that either the court should have given a unanimity instruction, or the State should have informed the jury which statement supported the criminal threat charge. But that error does not compel us to reverse.

*There is sufficient evidence to support the criminal threat conviction.*

Walker contends that the State presented insufficient evidence to sustain his conviction. Walker does not dispute that he made threatening statements to Davenport and Pryor. But he insists that the evidence demonstrated that his statements were made in the spur of the moment, so there was insufficient evidence to show he intended to place Davenport and Pryor in fear.

Sufficient evidence supports a conviction on appeal when, with the evidence viewed in a light most favorable to the State, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

We hold a rational juror could have found beyond a reasonable doubt that Walker intended to put Davenport and Pryor in fear. Davenport testified that when a man says something such as "I've got two bitches for you" it means that he will have other women come over and beat up a woman. Walker also testified that he was referring to using his gun when he told Pryor, "I have something for you as well," though he then backtracked. Even though Walker testified that "sometimes people say things [when] upset that they don't necessarily mean" and that he had merely made the statements "in the heat of the moment," the jury did not find that defense credible.

On appeal we do not retry cases. See *Chandler*, 307 Kan. at 668. The jury rejected Walker's defense and found him guilty of criminal threat beyond a reasonable doubt. It

18

rationally could do that based on the evidence before it. This issue is not grounds for reversal.

*Walker invited use of the initial aggressor jury instruction.*

In his final issue on appeal, Walker contends that the district court erred by giving the initial aggressor instruction. He argues that the instruction was neither legally nor factually appropriate, and this court should therefore reverse his convictions. In response, the State insists the instruction was appropriate and that any error was invited by Walker. The invited error doctrine comes into play here.

Under that doctrine, a litigant generally may not invite an error and then complain of the error on appeal. *State v. Stewart*, 306 Kan. 237, 248, 393 P.3d 1031 (2017). In a jury instruction context, that means that a defendant generally cannot challenge an instruction on appeal—even as clearly erroneous under K.S.A. 2020 Supp. 22-3414(3)—when defense counsel sought that instruction. *State v. Lowery*, 308 Kan. 1183, 1216-17, 427 P.3d 865 (2018). Courts will not, however, apply the doctrine if the record shows that defense counsel inadvertently requested a defective instruction. But if the record shows that defense counsel strategically sought the instruction, then the doctrine precludes appellate review. 308 Kan. at 1217-18 (applying *State v. Hargrove*, 48 Kan. App. 2d 522, 528, 293 P.3d 787 [2013]).

The record here shows that Walker's counsel invited the initial aggressor instruction. The district court at first declined to give the instruction because it thought that it could confuse the jurors under the facts here. But Walker then suggested the initial aggressor instruction and said that it would be preferable to the forcible felon instruction the court intended to give. The court then granted Walker's request. In other words, Walker's lawyer made a strategic decision to ask for the instruction.

19

So even if the initial aggressor instruction is legally or factually inappropriate, the court would not have given the instruction but for the request of Walker's counsel. He had objected to the forcible felon instruction, so if he believed that instruction was inappropriate, the issue was preserved for appellate review. In our view, any instructional error was invited, and Walker may not challenge it on appeal.

Convictions affirmed.