NOT DESIGNATED FOR PUBLICATION

No. 122,560

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DARRELL SHANE ROBINSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed December 17, 2021. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Kimberly A. Rodebaugh*, senior assistant district attorney, *Thomas R. Stanton*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., MALONE and BUSER, JJ.

PER CURIAM: A jury convicted Darrell Robinson of stalking after he sat in his parked car outside a house on multiple occasions. On appeal, he argues the evidence at trial was insufficient to support his conviction, claiming that his actions were constitutionally protected. He also asserts the district court erred by not providing certain instructions to the jury and challenges the constitutionality of the Kansas Sentencing Guidelines' procedure for considering an earlier stalking conviction. We are not persuaded by Robinson's arguments and thus affirm his conviction and sentence.

1

FACTUAL AND PROCEDURAL BACKGROUND

In March 2019, A.S. lived in Hutchinson with his children, his girlfriend, and his girlfriend's children. His house lies on a corner lot near an intersection and is accessible from two roads. A nearby business sits across the street from the front of the house, while the driveway and garage on the side of the house open onto a short access road that merges with another street.

Around midnight on March 30, a friend drove A.S.'s daughter home. As they drove up the access road to the driveway, the daughter noticed a red car parked in front of the business across the street from the front of the house. The daughter and her friend drove by the car and saw a man sitting inside who stared back as they drove past. Concerned, the daughter called A.S. and asked him to open the garage door and watch her walk inside. As the daughter got out of her friend's car, the red car pulled up, and the driver started talking to her, though she could not understand what the person said. She ran inside and told her father what happened.

Around 9:30 p.m. the next night, March 31, A.S. left to fill his daughter's car with gasoline. While leaving the access road, he noticed a red car parked in the same location as the night before. He called his daughter, who confirmed it was the same car, and asked her to turn on the porch light. He then drove around the block, pulled up behind the car, and turned on his bright lights. The red car left, and A.S. followed it for a few miles, noting its license plate number, until the driver—later identified as Robinson—pulled over. The two began talking. Robinson would not explain why he had parked across from A.S.'s house, stating only that it was a public street. A.S. told Robinson he had the make, model, and license plate number of Robinson's car and would "get" him if anything suspicious happened. The two then parted ways, and A.S. went to the gas station.

When A.S. returned home, a red car drove down the access road, honking its horn, before turning and driving by the front of the house. A.S.'s girlfriend called 911 sometime before 11 p.m., and the family came out onto the front porch to talk to police. While they did so, A.S. received two phone calls from an unidentified caller, which were recorded by an officer's bodycam. During the first call, the caller addressed A.S. by his first name before the call disconnected. The person called back a few minutes later but declined to identify himself. He stated he "pranked assholes" for a living, asked about A.S.'s employer and family members by name, and repeatedly stated A.S. now had his attention.

Shortly after the calls, A.S. and his daughter saw a red car parked in a parking lot near their house. Police stopped the car a few blocks away from the house and arrested Robinson.

Because Robinson had previously been convicted of stalking before his actions involving A.S.'s family, the State charged Robinson with felony stalking under K.S.A. 2018 Supp. 21-5427(a)(2). At trial, A.S. and his daughter explained what occurred. A.S.'s son-in-law stated that he saw a red car parked across the street from A.S.'s house a few evenings before March 30. And a car salesman who worked at the same business where A.S. worked testified that he showed Robinson a truck on March 29. Robinson texted the salesman the day after his arrest, stating he would not buy the truck because the salesman worked with "a piece of shit."

During his testimony, Robinson stated he did not know A.S. and had not met him before March 31. He admitted to parking across from A.S.'s house and making the phone calls but denied pulling up to talk to the daughter or driving by the house honking the next evening. He explained that he worked as a programmer providing technical support for a local business, and because of his interests in programming and computing, he parked outside the business across from A.S.'s house to perform passive network reconnaissance—scanning nearby computer networks to identify connected devices—as

3

self-training for a possible career in cybersecurity. He told the jury that he chose that location because of its proximity to other businesses and the absence of buildings to interfere with network signals.

Robinson testified that on March 30, he collected data for about half an hour before leaving. He stated that he returned the next evening to filter his results; he left after finishing but noticed a car was following him. Robinson explained that he eventually pulled over and spoke with A.S., but he became concerned when A.S. said he would "get" him because his wife also uses the car. Robinson testified that—to protect his wife—he performed a reverse address check online, found A.S.'s phone number and other personal information, and called A.S. to tell him he knew who he was.

After hearing the testimony of all witnesses, a jury found Robinson guilty of stalking. The district court sentenced him to a 120-month prison term and 24 months of postrelease supervision.

DISCUSSION

Robinson raises four issues on appeal. He challenges the sufficiency of the evidence, arguing his actions were constitutionally protected and cannot be used to support his conviction. He asserts the stalking statute contains alternative means of committing that offense, and the State failed to produce sufficient evidence to support each means. He also argues the court erred by failing to provide the jury an unrequested unanimity instruction because the case involved a multiple-acts issue. And he claims the court violated his state and federal constitutional rights by taking his previous stalking conviction into consideration at sentencing (consistent with the Kansas Sentencing Guidelines) instead of allowing his criminal history to be found by the jury.

For the reasons we explain in more detail below, we do not find Robinson's arguments persuasive. The evidence at trial was sufficient to support Robinson's conviction. K.S.A. 2018 Supp. 21-5427(a)(2) does not contain alternative means, and the case does not involve a multiple-acts issue. Finally, the Kansas Supreme Court has rejected Robinson's constitutional challenge to his sentence. We thus affirm Robinson's conviction and sentence.

1. *There was sufficient evidence presented to support Robinson's stalking conviction.*

Robinson's first argument challenges the sufficiency of the evidence supporting his conviction. Appellate courts review sufficiency challenges to determine whether a rational fact-finder, viewing the evidence in a light most favorable to the State, could have found the defendant guilty beyond a reasonable doubt. When doing so, appellate courts do not reweigh the evidence, resolve evidentiary conflicts, or make credibility assessments. *State v. Williams*, 308 Kan. 1439, Syl. ¶ 1, 430 P.3d 448 (2018).

The jury convicted Robinson of stalking under K.S.A. 2018 Supp. 21-5427(a)(2). That statute criminalizes "engaging in a course of conduct targeted at a specific person with knowledge that the course of conduct will place the targeted person in fear" for his or her own safety or the safety of that person's immediate family. K.S.A. 2018 Supp. 21-5427(a)(2). A "course of conduct" consists of "two or more acts over a period of time, however short, which evidence a continuity of purpose." K.S.A. 2018 Supp. 21-5427(f)(1). Constitutionally protected activity cannot form the basis of a conviction. K.S.A. 2108 Supp. 21-5427(f)(1).

K.S.A. 2018 Supp. 21-5427 contains a nonexhaustive list of actions that may form a course of conduct and thus give rise to a stalking conviction. K.S.A. 2018 Supp. 21-5427(f)(1)(A)-(G). The State based its charges, and the court instructed the jury, on two types of actions:

- "following, approaching or confronting the targeted person or a member of such person's immediate family" under K.S.A. 2018 Supp. 21-5427(f)(1)(B); and

- "appearing in close proximity to . . . the targeted person's residence . . . or the residence . . . of a member of such person's immediate family" under K.S.A. 2018 Supp. 21-5427(f)(1)(C).

Robinson acknowledges that he may have engaged in conduct that falls within these two categories. But he asserts that his actions were constitutionally protected and thus cannot give rise to an unlawful course of conduct. More specifically, Robinson argues that he had a constitutional right to drive and park on the public street near A.S.'s house. He also asserts that his phone calls were not true threats—a type of speech that falls outside the protections of the First Amendment to the United States Constitution. See *Virginia v. Black*, 538 U.S. 343, 358-59, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (describing types of speech not protected by First Amendment).

As a preliminary matter, we need not decide whether Robinson's phone calls to A.S. could be considered part of the course of conduct giving rise to his stalking conviction. Contrary to Robinson's arguments on appeal, the district court did not instruct the jury that the phone calls could be considered as part of an unlawful course of conduct; the court's instruction only included Robinson's presence near A.S.'s house and his following, approaching, or confronting A.S. or his immediate family. Appellate courts presume juries follow the court's instructions. *State v. Thurber*, 308 Kan. 140, 194, 420 P.3d 389 (2018). Thus, we need only consider whether Robinson's acts of driving by and parking near A.S.'s house, and talking to A.S.'s daughter, were sufficient to create a course of conduct that could give rise to his stalking conviction.

Robinson argues his presence on a public street was constitutionally protected conduct. The United States Supreme Court has suggested the United States Constitution may provide a right to be present in and use public spaces. See *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972) (describing how walking and loitering are "historically part of the amenities of life" to support finding that vagrancy ordinance was unconstitutionally vague); see also *City of Chicago v. Morales*, 527 U.S. 41, 53 n.20, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (plurality opinion) (three-justice plurality finding "right to engage in loitering that is entirely harmless in both purpose and effect" is a fundamental right protected by the Due Process Clause); but see 527 U.S. at 83-88 (Scalia, J., dissenting) (arguing against constitutional right to loiter); 527 U.S. at 102-06 (Thomas, J., dissenting) (same, joined by two justices).

But even if there were a constitutional right to remain in public places in some instances, Robinson's acts were not constitutionally protected. Constitutional rights cannot be used as a shield to violate the rights of others. *State v. Whitesell*, 270 Kan. 259, 272, 13 P.3d 887 (2000). For this reason, the *Morales* plurality recognized the right to loiter only extends to situations when doing so "is entirely harmless in both purpose and effect." 527 U.S. at 53 n.20. Here, the jury was tasked with determining whether Robinson acted—by parking outside A.S.'s house late at night, driving by that house honking, and driving up to A.S.'s daughter—with the knowledge that this course of conduct would place A.S. in fear of his own safety or the safety of his immediate family. It concluded that he did: that the purpose and effect of Robinson's actions were not entirely harmless. It is not this court's role to reweigh the evidence.

Robinson's actions were not constitutionally protected. Instead, viewed in the light most favorable to the State, the evidence showed that Robinson parked in close proximity to A.S.'s home for lengthy periods of time on at least two occasions, that he approached A.S.'s daughter, and that he drove by the house honking his horn. This evidence, along with the other evidence presented at trial, was sufficient to support the jury's finding that

7

Robinson engaged in a course of conduct targeting A.S. and his family, knowing it would cause them to fear for their safety. In short, the evidence was sufficient to support Robinson's conviction.

2. *K.S.A. 2018 Supp. 21-5427(a)(2) does not contain alternative means.*

Robinson next argues K.S.A. 2018 Supp. 21-5427(a)(2) contains alternative means to commit the crime of stalking because K.S.A. 2018 Supp. 21-5427(f)(1) lists multiple instances of behavior that may give rise to a course of conduct. Robinson asserts that this alleged error had a radiating effect, causing both instructional and evidentiary errors: If this case presents an alternative-means question, Robinson argues that the district court should have instructed the jury that they must be unanimous their findings (even though no instruction was requested at trial). Robinson also argues that there was not sufficient evidence to support the various means offered to the jury.

A crime involves alternative means when "only one crime was committed and only one conviction is possible," but the district court's instructions give the jury the option of convicting the defendant of that single offense under two or more statutory means. *State v. Anderson*, 308 Kan. 1251, 1255, 427 P.3d 847 (2018). Convictions that may result from alternative-means cases present special challenges because criminal defendants have a statutory right to a unanimous jury verdict. *State v. Holt*, 285 Kan. 760, 766-67, 175 P.3d 239 (2008) (citing K.S.A. 22-3421 and K.S.A. 22-3423[1][d]). For this reason, a district court must provide a unanimity jury instruction, informing the jurors that they must agree on the means giving rise to the crime. If they do not, the verdict must be reversed unless substantial evidence supports each alternative means of committing the offense. See *State v. Brown*, 295 Kan. 181, Syl. ¶ 1, 284 P.3d 977 (2012).

Not all methods of committing a crime create an alternative-means issue. Instead, courts differentiate alternative means—which require jury unanimity—from options

8

within a means—which do not. 295 Kan. at 194, 196-98. An alternative means generally involves language addressing "alternative distinct, material elements" such as the mens rea, the act requirement, or causation. 295 Kan. at 199-200. Language that "describes a material element or a factual circumstance that would prove the crime" generally creates options within a means. 295 Kan. at 200. Accord *Richardson v. United States*, 526 U.S. 813, 817-18, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999) (describing federal distinction between elements, which require unanimity, and means—or "brute facts"— which do not).

A statute's structure can indicate whether the legislature intended to create alternative means or options within a means. Alternative means are generally listed in different subsections; additional information included in a specific subsection is often an option within a means. *Brown*, 295 Kan. at 196. A definition that elaborates on the elements or language that describes factual circumstances that may prove a crime are usually options within a means. 295 Kan. at 198-99.

As it involves the sufficiency of the evidence, an alternative means challenge may be raised for the first time on appeal. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014). The preliminary issue in these cases—whether a statute creates alternative means— requires statutory interpretation, which presents a legal question that appellate courts review de novo. 299 Kan. at 32.

Robinson argues an alternative-means issue exists because the jury never indicated which underlying conduct gave rise to his stalking conviction. Although he does not analyze the statute's language, he appears to base his argument on K.S.A. 2018 Supp. 21-5427(f)(1), which defines a course of conduct. The State relies on *State v. Killingsworth*, No. 104,690, 2012 WL 1759398, at *4-6 (Kan. App. 2012) (unpublished opinion), which found that K.S.A. 2010 Supp. 21-3848(a)(3), currently codified as K.S.A. 2020 Supp. 21-

5427(a)(3) and which requires proof of at least one act described in the course of conduct definition, did not give rise to an alternative-means issue.

We agree with the *Killingsworth* panel and the State that the course-of-conduct language in K.S.A. 2018 Supp. 21-5427(a)(2) does not create alternative means for committing the crime of stalking. The statute's act requirement involves a course of conduct. K.S.A. 2018 Supp. 21-5427(f)(1) simply defines that element, explaining what factual circumstances can be included in a course of conduct. K.S.A. 2018 Supp. 21-5427(a)(2) focuses on the cumulative effect of the individual acts, which reflects a greater concern for the relationship between the acts rather than the individual conduct itself. See *Whitesell*, 270 Kan. at 272 (a purpose of stalking statute is to prevent violence before it occurs and provide means of protection from recurring intimidating and fear-inducing conduct). The individual acts listed are not necessarily unlawful, underscoring the legislative concern with the aggregate conduct. See *Richardson*, 526 U.S. at 818-19 (in determining whether crime of committing a series of federal drug law violations constituted one element [a series] or many elements [violations], noting use of word "violation" sounds in criminal law, which would require unanimity). These considerations all lead us to conclude that K.S.A. 2018 Supp. 21-5427(f)(1) creates options within a means of committing a course of conduct under K.S.A. 2018 Supp. 21-5427(a)(2) and not alternative means for committing the crime of stalking.

Because options within a means do not require jury unanimity, a specific unanimity instruction was not required. And because there is evidence in the record that Robinson engaged in a course of conduct under K.S.A. 2018 Supp. 21-5427(f)(1)(B) or (C) and targeted at A.S. with knowledge that the course of conduct would place him or his family in fear, the evidence is sufficient to support Robinson's conviction.

3. *Because K.S.A. 2018 Supp. 21-5427(a)(2) requires a course of conduct, Robinson's case does not present a multiple-acts issue.*

Robinson also argues his case presents a multiple-acts issue, asserting again that the district court should have instructed the jury on the unanimity requirement for the particular course of conduct. A multiple-acts case arises when "multiple crimes were committed for which the State could have obtained multiple convictions, but the State chose to only charge one count of the crime." *Anderson*, 308 Kan. at 1255. To ensure unanimity in a multiple-acts case, the court must either provide a unanimity jury instruction or the State must choose which acts to rely on to support the conviction. *State v. Colston*, 290 Kan. 952, 961, 235 P.3d 1234 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). If neither occurs, a conviction may be overturned upon a showing of reversible error. *Colston*, 290 Kan. at 961, 969.

"'Multiple acts' are legally and factually separate incidents that independently satisfy the elements of the charged offense." *State v. De La Torre*, 300 Kan. 591, 598, 331 P.3d 815 (2014). Although there is no single test to determine whether acts are factually separate, courts often look at whether (1) the acts occurred at or around the same time; (2) they occurred at or near the same location; (3) a causal relationship exists between the various acts, in particular whether there was an intervening event; and (4) a fresh impulse motivated some of the acts. *State v. King*, 297 Kan. 955, 981, 305 P.3d 641 (2013); *State v. Allen*, 290 Kan. 540, 544, 232 P.3d 861 (2010). Actions that form part of a single continuous course of conduct are not factually separate and do not consist of multiple acts. *King*, 297 Kan. at 980-81; see also *State v. Ultreras*, 296 Kan. 828, 856, 295 P.3d 1020 (2013) (acts that are part of an overall design or objective may create a continuing course of conduct). If the conduct is unitary—such as when the acts combine to form a course of conduct—no multiple-acts issue exists. *King*, 297 Kan. at 980; *State v. Trujillo*, 296 Kan. 625, 629, 294 P.3d 281 (2013). The existence of a multiple-acts issue is a legal question reviewed de novo. *King*, 297 Kan. at 981.

11

In support of his argument, Robinson's reply brief cites *Killingsworth*, which held that a different stalking offense—violating a protection-from-stalking order under K.S.A. 2010 Supp. 21-3438(a)(3)—presented a multiple-acts question. And he asserts that the events in this case took place over two evenings, demonstrating that these were distinct acts. The State disagrees, pointing to out-of-state cases to support its argument that no individual act could have met the course-of-conduct requirement.

We conclude that a single stalking conviction under K.S.A. 2018 Supp. 21-5427(a)(2) does not create a multiple-acts issue. That subsection requires a *course of conduct*, which entails a *series of actions*—that is, at least two acts—that evidence a continuity of purpose. See K.S.A. 2018 Supp. 21-5427(a)(2), (f)(1). In contrast, a multiple-acts case requires acts that could each constitute the charged crime. Because a course of conduct requires at least two actions, no individual act could have resulted in a conviction.

This requirement differentiates this case from *Killingsworth*. At issue in *Killingsworth* was K.S.A. 2010 Supp. 21-3438(a)(3), which required proof of any single act described under the course of conduct definition following service with a protective order. 2012 WL 1759398, at *4-6. While a single action could result in a conviction under K.S.A. 2010 Supp. 21-3438(a)(3), the same is not true under K.S.A. 2018 Supp. 21-5427(a)(2).

Similarly, courts in other states have found stalking statutes that prohibit conduct reflecting a continuity of purpose do not entail jury unanimity. See *People v. Zavala*, 130 Cal. App. 4th 758, 768-69, 30 Cal. Rptr. 3d 398 (2005) (because stalking requires a course of conduct occurring over a period of time, no unanimity instruction required); *People v. Carey*, 198 P.3d 1223, 1226, 1236 (Colo. App. 2008) (based on phone calls made in single day, no unanimity requirement because prosecution had to prove a course of conduct that constituted a single transaction); *State v. Miner*, 363 S.W.3d 145, 148

(Mo. Ct. App. 2012) (course of conduct met because stalking required a pattern of conduct); *State v. Hoxie*, 963 S.W.2d 737, 743 (Tenn. 1998) (stalking statute requires proof of continuous course of conduct as it contemplates a series of individual but related actions); see also *Cook v. State*, 36 P.3d 710, 720-22 (Alaska App. 2001) (in finding no plain error as no dispute existed over whether underlying conduct occurred, collecting cases explaining that stalking does not require unanimity); *Washington v. United States*, 760 A.2d 187, 198 (D.C. 2000) (separate incidents were not legally or factually separate); but see *People v. Wagner*, 434 P.3d 731,740 n.2 (Colo. App. 2018) (noting jury unanimity issue may arise if charged crime is composed of multiple distinct acts).

Because no single action can result in a stalking conviction under K.S.A. 2018 Supp. 21-5427(a)(2), the crime of stalking as defined in that statute does not implicate multiple acts. As such, the district court was not required to instruct the jurors that they must unanimously agree on the acts giving rise to the unlawful course of conduct. Again, Robinson has not apprised us of any error in the district court's instructions to the jury.

4. *Robinson's sentencing claim is without merit.*

Finally, Robinson argues the district court violated section 5 of the Kansas Constitution Bill of Rights and the Sixth and Fourteenth Amendments to the United States Constitution when it failed to submit Robinson's prior stalking conviction, which it used to enhance his sentence, to the jury. But this argument has been foreclosed by our reviewing courts. In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the United States Supreme Court held the Sixth Amendment does not require a jury to determine the existence of a prior conviction. This includes previous convictions used to enhance a sentence. See *King*, 297 Kan. 955, Syl. ¶ 9. The Kansas Supreme Court has reached the same conclusion under section 5 of the Kansas Constitution Bill of Rights. *State v. Albano*, 313 Kan. 638, 656-57, 487 P.3d 750 (2021).

Thus, the State was not required to prove Robinson's previous stalking conviction to a jury. The district court acted properly when it used that conviction to enhance Robinson's sentence.

Affirmed.